## UNITED STATES ET AL. *v.* STANLEY

No. 86–393.   Argued April 21, 1987—Decided June 25, 1987

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined, and in Part I of which BRENNAN, MARSHALL, STEVENS, and O'CONNOR, JJ., joined.

BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, and in Part III of which STEVENS, J., joined, *post*, p. 686. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 708.

*Christopher J. Wright* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Ayer, Barbara L. Herwig,* and *Mark W. Pennak.*

*Richard A. Kupfer* argued the cause and filed a brief for respondent.

JUSTICE SCALIA delivered the opinion of the Court.*

In February 1958, James B. Stanley, a master sergeant in the Army stationed at Fort Knox, Kentucky, volunteered to participate in a program ostensibly designed to test the effectiveness of protective clothing and equipment as defenses against chemical warfare. He was released from his then-current duties and went to the Army's Chemical Warfare Laboratories at the Aberdeen Proving Grounds in Maryland. Four times that month, Stanley was secretly administered doses of lysergic acid diethylamide (LSD), pursuant to an Army plan to study the effects of the drug on human subjects. According to his Second Amended Complaint (the allegations of which we accept for purposes of this decision), as a result of the LSD exposure, Stanley has suffered from hallucinations and periods of incoherence and memory loss, was impaired in his military performance, and would on occasion "awake from sleep at night and, without reason, violently beat his wife and children, later being unable to recall the entire incident." App. 5. He was discharged from the Army in 1969. One year later, his marriage dissolved because of the personality changes wrought by the LSD.

On December 10, 1975, the Army sent Stanley a letter soliciting his cooperation in a study of the long-term effects of LSD on "volunteers who participated" in the 1958 tests.

---

*JUSTICE STEVENS joins Part I of this opinion.

This was the Government's first notification to Stanley that he had been given LSD during his time in Maryland. After an administrative claim for compensation was denied by the Army, Stanley filed suit under the Federal Tort Claims Act (FTCA), 28 U. S. C. § 2671 *et seq.*, alleging negligence in the administration, supervision, and subsequent monitoring of the drug testing program.

The District Court granted the Government's motion for summary judgment, finding that Stanley "was at all times on active duty and participating in a bona fide Army program during the time the alleged negligence occurred," No. 78–8141–Civ–CF, p. 2 (SD Fla., May 14, 1979), and that his FTCA suit was therefore barred by the doctrine of *Feres* v. *United States*, 340 U. S. 135 (1950), which determined that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.*, at 146. The Court of Appeals for the Fifth Circuit agreed that the *Feres* doctrine barred Stanley's FTCA suit against the United States, but held that the District Court should have dismissed for lack of subject-matter jurisdiction rather than disposing of the case on the merits. *Stanley* v. *CIA*, 639 F. 2d 1146 (1981). The Government contended that a remand would be futile, because *Feres* would bar any claims that Stanley could raise either under the FTCA or directly under the Constitution against individual officers under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). The court concluded, however, that Stanley "has at least a colorable constitutional claim based on *Bivens*," 639 F. 2d, at 1159, and remanded "for the consideration of the trial court of any amendment which the appellant may offer, seeking to cure the jurisdictional defect." *Id.*, at 1159–1160.

Stanley then amended his complaint to add claims against unknown individual federal officers for violation of his constitutional rights. He also specifically alleged that the United States' failure to warn, monitor, or treat him after he

was discharged constituted a separate tort which, because occurring subsequent to his discharge, was not "incident to service" within the *Feres* exception to the FTCA. See *United States* v. *Brown*, 348 U. S. 110 (1954). The District Court dismissed the FTCA claim because the alleged negligence was not "separate and distinct from any acts occurring before discharge, so as to give rise to a separate actionable tort not barred by the *Feres* doctrine." 549 F. Supp. 327, 329 (SD Fla. 1982). It refused, however, to dismiss the *Bivens* claims. The court rejected, *inter alia*, the Government's argument that the same considerations giving rise to the *Feres* exception to the FTCA should constitute "special factors" of the sort alluded to in *Bivens*, *supra*, at 396, and other cases as bars to a *Bivens* action. It cited as sole authority for that rejection the Court of Appeals for the Ninth Circuit's decision in *Wallace* v. *Chappell*, 661 F. 2d 729 (1981). *Sua sponte*, the court certified its order for interlocutory appeal under 28 U. S. C. § 1292(b).

Following issuance of the order, the Government moved for partial final judgment pursuant to Federal Rule of Civil Procedure 54(b)[1] on behalf of itself and three federal agencies that had (improperly) been named as FTCA defendants throughout the proceedings. The Government also argued that because no individual defendants had been named or served, and thus had neither appeared as parties nor sought representation from the Department of Justice, there was no one to seek interlocutory review of the court's refusal to dismiss the *Bivens* actions. The court concluded that the Government's contentions were "well taken," *Stanley* v. *CIA*, 552 F. Supp. 619 (SD Fla. 1982), and on November 9, 1982, it granted the motion for partial final judgment, ordered the

---

[1] "When more than one claim for relief is presented . . . , the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

Clerk to "enter final judgment in favor of the United States forthwith," *ibid.*, and vacated the portion of its prior order ruling on the *Bivens* claims against the individual defendants, giving Stanley 90 days to serve at least one individual defendant. The docket sheet for the case reflects the terms of that order ("The clerk to enter final judgment in favor of USA," App. to Brief in Opposition A4), but does not indicate that an additional "separate document," Fed. Rule Civ. Proc. 58, containing the judgment was entered. See Fed. Rule Civ. Proc. 79(a).

Stanley then filed his Second Amended Complaint, naming as defendants nine individuals (seven of whom are before us as petitioners) and the Board of Regents of the University of Maryland,[2] and asserting civil rights claims under 42 U. S. C. §§ 1983 and 1985. Motions to dismiss for lack of personal jurisdiction and improper venue were filed on behalf of some of the defendants (it was alleged that proper service had not been made on the others), but before those motions were ruled on, we issued our decision in *Chappell* v. *Wallace*, 462 U. S. 296 (1983), holding that "enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations," *id.*, at 305, and reversing the sole authority cited by the District Court in its prior order refusing to dismiss Stanley's *Bivens* claims. Stanley's counsel brought the *Chappell* decision to the attention of the District Court, which, apparently treating the fil-

---

[2]The named defendants are Joseph R. Bertino, M. D.; Board of Regents of the University of Maryland; H. D. Collier; Albert Dreisbach; Bernard G. Elfert; Sidney Gottlieb, M. D.; Richard Helms; Gerald Klee, M. D.; Van Sim, M. D.; Walter Weintraub, M. D.; and unknown individual federal and state agents and officers. Klee and Weintraub, who are not parties to this appeal, were employees of the University of Maryland in 1958; the rest of the individual defendants, petitioners in this action, are alleged to have been federal employees or agents involved at some point in the drug testing program or followup. Stanley claims that these names first became available to him from the record in *Sweet* v. *United States*, 687 F. 2d 246 (CA8 1982), a case raising nearly identical claims.

ing of the Second Amended Complaint as automatically reinstating its previously vacated order concerning the *Bivens* claims, *sua sponte* reconsidered and reaffirmed its prior decision. It concluded that, despite the broadly stated holding of the case, *Chappell* did not "totally ba[r] *Bivens* actions by servicemen for torts committed against them during their term of service." 574 F. Supp. 474, 478 (1983). Rather, it said, *Chappell* only bars *Bivens* actions when "a member of the military brings a suit against a superior officer for wrongs which involve direct orders in the performance of military duty and the discipline and order necessary thereto," 574 F. Supp., at 479, factors that in its view were not involved in Stanley's claim. Nor could the court find in congressionally prescribed remedies, such as the Veterans' Benefits Act, 38 U. S. C. § 301 *et seq.*, any expression of exclusivity of the sort *Bivens* contemplated would preclude recovery. See 403 U. S., at 397. The court again certified its order for interlocutory appeal under § 1292(b), which petitioners sought and the Court of Appeals for the Eleventh Circuit granted.

The Court of Appeals affirmed the conclusion that *Chappell* does not require dismissal of Stanley's *Bivens* claims, on essentially the grounds relied upon by the District Court. 786 F. 2d 1490 (1986). The court did not think that Congress' activity in the military justice field was a "special facto[r]" precluding Stanley's claim, as "[t]hose intramilitary administrative procedures which the Court found adequate to redress the servicemen's racial discrimination complaints in *Chappell* are clearly inadequate to compensate Stanley for the violations complained of here." *Id.*, at 1496.

Although the issue had not been addressed in the order from which the interlocutory appeal was taken, the Court of Appeals further determined that recent precedent in the Eleventh Circuit, including *Johnson* v. *United States*, 749 F. 2d 1530 (1985), rev'd, 481 U. S. 681 (1987), indicated that Stanley might have a viable FTCA claim against the United States, and that law-of-the-case principles therefore did not

require adherence to the 1982 holding that Stanley's FTCA claim was barred by *Feres*. It remanded with instructions to the District Court to "allow Stanley the opportunity to amend to plead consistent with recent precedent." 786 F. 2d, at 1499.

Because the Courts of Appeals have not been uniform in their interpretation of the holding in *Chappell*,[3] and because the Court of Appeals' reinstatement of Stanley's FTCA claims seems at odds with sound judicial practice, we granted certiorari. 479 U. S. 1005 (1986).

## I

We first address the Court of Appeals' instruction to the District Court to allow Stanley to replead his FTCA claim. While petitioners advance several reasons why that action was improper, and additional reasons can perhaps be found in our recent decision in *United States* v. *Johnson*, 481 U. S. 681 (1987), we find it necessary to discuss only one. The case did not come before the Court of Appeals on appeal from a final decision of the District Court under 28 U. S. C. § 1291. Rather, the Court of Appeals had jurisdiction pursuant to § 1292(b), which provides:

> "When a district judge in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that *such order* involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal *from the order* may materially advance the ultimate termination of the litigation, he shall so state in writing in

---

[3] See *Jorden* v. *National Guard Bureau*, 799 F. 2d 99, 107–108 (CA3 1986) (§ 1983); *Trerice* v. *Summons*, 755 F. 2d 1081, 1082–1084 (CA4 1985); *Mollnow* v. *Carlton*, 716 F. 2d 627, 629–630 (CA9 1983), cert. denied, 465 U. S. 1100 (1984); *Gaspard* v. *United States*, 713 F. 2d 1097, 1103–1104 (CA5 1983), cert. denied *sub nom. Sheehan* v. *United States*, 466 U. S. 975 (1984).

such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken *from such order* . . . ." (Emphasis added.)

An appeal under this statute is from the *certified order*, not from any other orders that may have been entered in the case. Even if the Court of Appeals' jurisdiction is not confined to the precise question certified by the lower court (because the statute brings the "order," not the question, before the court), that jurisdiction *is* confined to the particular order appealed from. Commentators and courts have consistently observed that "the scope of the issues open to the court of appeals is closely limited to the order appealed from [and] [t]he court of appeals will not consider matters that were ruled upon in other orders." 16 C. Wright, A. Miller, E. Cooper, & E. Gressman, Federal Practice and Procedure § 3929, p. 143 (1977). See *Pritchard-Keang Nam Corp.* v. *Jaworski*, 751 F. 2d 277, 281, n. 3 (CA8 1984), cert. dism'd, 472 U. S. 1022 (1985); *United States* v. *Bear Marine Services*, 696 F. 2d 1117, 1119, n. 1 (CA5 1983); *Time, Inc.* v. *Ragano*, 427 F. 2d 219, 221 (CA5 1970).

Here, the "order appealed from" was an order refusing to dismiss Stanley's *Bivens* claims on the basis of our holding in *Chappell*. The Court of Appeals therefore had no jurisdiction to enter orders relating to Stanley's long-dismissed FTCA claims, whether or not, as Stanley argues, "the issues involved in the *Bivens* claim and the alleged immunity of the individual defendants closely parallels *[sic]* the government's immunity due to the *Feres* doctrine . . . [and] that is what all parties were arguing about in the interlocutory appeal." Brief for Respondent 17–18. The Court of Appeals' action is particularly astonishing in light of the fact that the United States was not even a party to the appeal, which involved only Stanley and the individual *Bivens* defendants (Stanley's *Bivens* claim against the United States having been dis-

missed by the District Court in 1982).   We vacate that portion of the Court of Appeals' judgment.[4]

## II

That leaves the Court of Appeals' ruling that Stanley can proceed with his *Bivens* claims notwithstanding the decision in *Chappell*.   In our view, the court took an unduly narrow view of the circumstances in which courts should decline to permit nonstatutory damages actions for injuries arising out of military service.

In *Bivens*, we held that a search and seizure that violates the Fourth Amendment can give rise to an action for damages against the offending federal officials even in the absence of a statute authorizing such relief.   We suggested in dictum that inferring such an action directly from the Constitution might not be appropriate when there are "special factors counselling hesitation in the absence of affirmative action by Congress," 403 U. S., at 396, or where there is an "explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress."   *Id.*, at 397.   We subsequently held that actions for damages could be brought directly under the Due Process Clause of the Fifth Amendment, *Davis* v. *Passman*, 442 U. S. 228 (1979), and under the Eighth Amendment's proscription against cruel and unusual punishment, *Carlson* v. *Green*, 446 U. S. 14 (1980), repeating each time the dictum that "special factors counselling hesitation" or an "explicit congressional declaration" that another remedy is exclusive would bar such an action.   442 U. S., at 246–247; 446 U. S., at 18–19.   In *Chappell* (and in *Bush* v. *Lucas*, 462 U. S. 367

---

[4] For the same reasons, however, it was proper for the Court of Appeals to decline to rule on the civil rights claims against Klee, Weintraub, and the University of Maryland Board of Regents, which were not addressed in the District Court's order.   We similarly decline the Government's invitation, Brief for Petitioners 25, n. 17, to rule on those claims.

(1983), decided the same day), that dictum became holding. *Chappell* reversed a determination that no "special factors" barred a constitutional damages remedy on behalf of minority servicemen who alleged that because of their race their superior officers "failed to assign them desirable duties, threatened them, gave them low performance evaluations, and imposed penalties of unusual severity." 462 U. S., at 297. We found "factors counselling hesitation" in "[t]he need for special regulations in relation to military discipline, and the consequent need and justification for a special and exclusive system of military justice . . . ." *Id.*, at 300. We observed that the Constitution explicitly conferred upon Congress the power, *inter alia*, "[t]o make Rules for the Government and Regulation of the land and naval Forces," U. S. Const. Art. I, § 8, cl. 14, thus showing that "the Constitution contemplated that the Legislative Branch have plenary control over rights, duties, and responsibilities in the framework of the Military Establishment . . . ." 462 U. S., at 301. Congress, we noted, had exercised that authority to "establis[h] a comprehensive internal system of justice to regulate military life, taking into account the special patterns that define the military structure." *Id.*, at 302. We concluded that "[t]aken together, the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Id.*, at 304.

Stanley seeks to distance himself from this holding in several ways. First, he argues that the defendants in this case were not Stanley's superior military officers, and indeed may well have been civilian personnel, and that the chain-of-command concerns at the heart of *Chappell* and cases such as *Gaspard* v. *United States*, 713 F. 2d 1097, 1103–1104 (CA5 1983) (plaintiff was ordered to expose himself to radiation from nuclear test), cert. denied *sub nom. Sheehan* v. *United States*, 466 U. S. 975 (1984), are thus not implicated. Sec-

ond, Stanley argues that there is no evidence that this injury was "incident to service," because we do not know the precise character of the drug testing program, the titles and roles of the various individual defendants, or Stanley's duty status when he was at the Maryland testing grounds. If that argument is sound, then even if *Feres* principles apply fully to *Bivens* actions, further proceedings are necessary to determine whether they apply to this case.

The second argument, however, is not available to Stanley here. The issue of service incidence, as that term is used in *Feres*, was decided adversely to him by the Court of Appeals in 1981, 639 F. 2d, at 1150–1153, and there is no warrant for reexamining that ruling here. See *Allen* v. *McCurry*, 449 U. S. 90, 94 (1980). As for his first argument, Stanley and the lower courts may well be correct that *Chappell* implicated military chain-of-command concerns more directly than do the facts alleged here; in the posture of this case, one must assume that at least some of the defendants were not Stanley's superior officers, and that he was not acting under orders from superior officers when he was administered LSD. It is therefore true that *Chappell* is not strictly controlling, in the sense that no holding can be broader than the facts before the court. It is even true that some of the language of *Chappell*, explicitly focusing on the officer-subordinate relationship that existed in the case at hand, would not be applicable here. To give controlling weight to those facts, however, is to ignore our plain statement in *Chappell* that "[t]he 'special factors' that bear on the propriety of respondents' *Bivens* action also formed the basis of this Court's decision in *Feres* v. *United States*," 462 U. S., at 298, and that "[a]lthough this case concerns the limitations on the type of nonstatutory damages remedy recognized in *Bivens*, rather than Congress' intent in enacting the Federal Tort Claims Act, the Court's analysis in *Feres* guides our analysis in this case." *Id.*, at 299. Since *Feres* did not consider the officer-subordinate relationship crucial, but established instead an "incident to

service" test, it is plain that our reasoning in *Chappell* does not support the distinction Stanley would rely on.

As we implicitly recognized in *Chappell*, there are varying levels of generality at which one may apply "special factors" analysis. Most narrowly, one might require reason to believe that in the particular case the disciplinary structure of the military would be affected—thus not even excluding *all* officer-subordinate suits, but allowing, for example, suits for officer conduct so egregious that no responsible officer would feel exposed to suit in the performance of his duties. Somewhat more broadly, one might disallow *Bivens* actions whenever an officer-subordinate relationship underlies the suit. More broadly still, one might disallow them in the officer-subordinate situation and also beyond that situation when it affirmatively appears that military discipline would be affected. (This seems to be the position urged by Stanley.) Fourth, as we think appropriate, one might disallow *Bivens* actions whenever the injury arises out of activity "incident to service." And finally, one might conceivably disallow them by servicemen entirely. Where one locates the rule along this spectrum depends upon how prophylactic one thinks the prohibition should be (*i. e.*, how much occasional, unintended impairment of military discipline one is willing to tolerate), which in turn depends upon how harmful and inappropriate judicial intrusion upon military discipline is thought to be. This is essentially a policy judgment, and there is no scientific or analytic demonstration of the right answer. Today, no more than when we wrote *Chappell*, do we see any reason why our judgment in the *Bivens* context should be any less protective of military concerns than it has been with respect to FTCA suits, where we adopted an "incident to service" rule. In fact, if anything we might have felt freer to compromise military concerns in the latter context, since we were confronted with an explicit congressional authorization for judicial involvement that was, on its face, unqualified; whereas here we are confronted with an explicit constitutional au-

thorization for *Congress* "[t]o make Rules for the Government and Regulation of the land and naval Forces," U. S. Const., Art. I, §8, cl. 14, and rely upon inference for our own authority to allow money damages.[5] This is not to say, as JUSTICE BRENNAN's dissent characterizes it, *post*, at 707, that all matters within congressional power are exempt from *Bivens*. What is distinctive here is the specificity of that technically superfluous grant of power,[6] and the insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the Army, Navy, and militia upon the political branches. All this counsels hesitation in our creation of damages remedies in this field.

The other major factor determining at which point, along the spectrum of generality, one should apply *Chappell*'s "special factors" analysis consists of the degree of disruption which each of them will in fact produce. This is an analytic rather than a policy judgment—but once again we see no reason why it should differ in the *Bivens* and the *Feres* contexts. Stanley underestimates the degree of disruption that would be caused by the rule he proposes. A test for liability that depends on the extent to which particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters. Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concern-

---

[5] This distinction also explains why the author of this opinion, who dissented in *United States* v. *Johnson*, 481 U. S. 681 (1987), because he saw no justification for adopting a military affairs exception to the FTCA, see *id.*, at 692, believes that consideration of such an exception to *Bivens* liability is appropriate. And if exception is to be made, there is, as *Chappell* recognized, no reason for it to be narrower under *Bivens* than under the FTCA.

[6] Had the power to make rules for the military not been spelled out, it would in any event have been provided by the Necessary and Proper Clause, U. S. Const, Art. I, §8, cl. 18—as is, for example, the power to make rules for the government and regulation of the Postal Service.

ing the details of their military commands. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime. The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.

Contrary to the view of the Court of Appeals, 786 F. 2d, at 1496, it is irrelevant to a "special factors" analysis whether the laws currently on the books afford Stanley, or any other particular serviceman, an "adequate" federal remedy for his injuries. The "special facto[r]" that "counsel[s] hesitation" is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate. Similarly irrelevant is the statement in *Chappell*, erroneously relied upon by Stanley and the lower courts, that we have "never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." 462 U. S., at 304. As the citations immediately following that statement suggest, it referred to redress designed to halt or prevent the constitutional violation rather than the award of money damages. See *Brown* v. *Glines*, 444 U. S. 348 (1980); *Parker* v. *Levy*, 417 U. S. 733 (1974); *Frontiero* v. *Richardson*, 411 U. S. 677 (1973). Such suits, like the case of *Wilkes* v. *Dinsman*, 7 How. 89 (1849), distinguished in *Chappell*, 462 U. S., at 305, n. 2, sought traditional forms of relief, and "did not ask the Court to imply a new kind of cause of action." *Ibid.*

We therefore reaffirm the reasoning of *Chappell* that the "special factors counselling hesitation"—"the unique disciplinary structure of the Military Establishment and Congress' activity in the field," *id.*, at 304—extend beyond the situation in which an officer-subordinate relationship exists, and require abstention in the inferring of *Bivens* actions as exten-

sive as the exception to the FTCA established by *Feres* and *United States* v. *Johnson*.   We hold that no *Bivens* remedy is available for injuries that "arise out of or are in the course of activity incident to service."   340 U. S., at 146.

Part II of JUSTICE BRENNAN's opinion argues in essence that because the refusal to entertain a *Bivens* action has the same effect as a grant of unqualified immunity, we should find "special factors" sufficient to preclude a *Bivens* action only when our immunity decisions would absolutely foreclose a money judgment against the defendant officials.   The short answer to this argument is that *Chappell* made no reference to immunity principles, and *Bivens* itself explicitly distinguished the question of immunity from the question whether the Constitution directly provides the basis for a damages action against individual officers.   403 U. S., at 397.   The analytic answer is that the availability of a damages action under the Constitution for particular *injuries* (those incurred in the course of military service) is a question logically distinct from immunity to such an action on the part of particular *defendants*.   When liability is asserted under a statute, for example, no one would suggest that whether a cause of action exists should be determined by consulting the scope of common-law immunity enjoyed by actors in the area to which the statute pertains.   Rather, one applies that immunity (unless the statute says otherwise) *to* whatever actions and remedies the terms of the statute are found to provide.   Similarly, the *Bivens* inquiry in this case—whether a damages action for injury in the course of military service can be founded directly upon the Constitution—is analytically distinct from the question of official immunity from *Bivens* liability.

We do not understand JUSTICE BRENNAN to dispute this. Rather, he argues that the answer to the former inquiry should be such that it produces a result coextensive with the answer to the latter.   That is of course quite possible to achieve, since one can adjust the definition of a cause of ac-

tion to produce precisely the same results as a given defini-
tion of immunity. For example, if a State wanted to elimi-
nate driver liability for automobile accidents, it could *either*
prescribe that all automobile drivers are immune from suit
for injuries caused by their negligent driving *or* prescribe
that no cause of action exists for injuries caused by negligent
driving. But what JUSTICE BRENNAN fails to produce is any
*reason* for creating such an equivalency in the present case
(and, presumably, in all *Bivens* actions). In the sole case he
relies upon for his novel analysis, *Davis* v. *Passman*, 442
U. S. 228 (1979), there was a reason. There the Constitu-
tion itself contained an applicable immunity provision—the
Speech or Debate Clause, Art. I, § 6, cl. 1—which rendered
Members of Congress immune from suit for their legislative
activity. The Court held that the "special concerns counsel-
ing hesitation" in the inference of *Bivens* actions in that area
"are coextensive with the protections afforded by the Speech
or Debate Clause." 442 U. S., at 246. That is to say, the
Framers addressed the special concerns in that field through
an immunity provision—and had they believed further pro-
tection was necessary they would have expanded that immu-
nity provision. It would therefore have distorted their plan
to achieve the same effect as more expansive immunity by
the device of denying a cause of action for injuries caused by
Members of Congress where the constitutionally prescribed
immunity does not apply.

Thus, *Davis* v. *Passman* would be relevant here if the
Constitution contained a grant of immunity to military per-
sonnel similar to the Speech or Debate Clause. It does not,
of course, and so we are compelled in the military field, as in
others, to make our own assessment of whether, given the
"special concerns counseling hesitation," *Bivens* actions will
lie. There is no more reason why court-created rules of im-
munity (as opposed to immunity specifically prescribed in the
Constitution) should be held *a priori* to describe the limit of
those concerns here than in any other field. Thus, the rule

JUSTICE BRENNAN proposes is not an application but a repudiation of the "special factors" limitation upon the inference of *Bivens* actions. That limitation is quite hollow if it does nothing but duplicate pre-existing immunity from suit.

For the foregoing reasons, we vacate the Court of Appeals' judgment that Stanley can assert an FTCA claim on remand to the District Court and reverse its judgment refusing to dismiss the *Bivens* claims against petitioners. The judgment of the Court of Appeals is reversed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE STEVENS joins as to Part III, concurring in part and dissenting in part.

In experiments designed to test the effects of lysergic acid diethylamide (LSD), the Government of the United States treated thousands of its citizens as though they were laboratory animals, dosing them with this dangerous drug without their consent. One of the victims, James B. Stanley, seeks compensation from the Government officials who injured him. The Court holds that the Constitution provides him with *no remedy*, solely because his injuries were inflicted while he performed his duties in the Nation's Armed Forces. If our Constitution required this result, the Court's decision, though legally necessary, would expose a tragic flaw in that document. But in reality, the Court disregards the commands of our Constitution, and bows instead to the purported requirements of a different master, *military discipline*, declining to provide Stanley with a remedy because it finds "special factors counselling hesitation." *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 396 (1971). This is abdication, not hesitation. I dissent.[1]

[1] I agree with the Court that Stanley's cause of action under the Federal Tort Claims Act (FTCA) should not have been reinstated by the Court of Appeals. Thus, I join in Part I of the Court's opinion.

## I

Before addressing the legal questions presented, it is important to place the Government's conduct in historical context. The medical trials at Nuremberg in 1947 deeply impressed upon the world that experimentation with unknowing human subjects is morally and legally unacceptable. The United States Military Tribunal established the Nuremberg Code as a standard against which to judge German scientists who experimented with human subjects. Its first principle was:

> "1. *The voluntary consent of the human subject is absolutely essential.*
>
> .          .          .          .          .
>
> "The duty and responsibility for ascertaining the quality of the consent rests upon *each individual* who initiates, directs or engages in the experiment. *It is a personal duty and responsibility which may not be delegated to another with impunity.*" *United States* v. *Brandt* (The Medical Case), 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, pp. 181–182 (1949) (emphasis added).

The United States military developed the Code, which applies to all citizens—soldiers as well as civilians.[2]

---

[2] See, *e. g.*, Mulford, Experimentation on Human Beings, 20 Stan. L. Rev. 99, 105, n. 34 (1967) (Military personnel cannot be compelled to submit to nontherapeutic procedures) (citing Johnson, Civil Rights of Military Personnel Regarding Medical Care and Experimental Procedures, 117 Science 212–215 (1953)). Indeed, the application of such principles to all citizens, including soldiers, is essential in a society governed by law:

"[Human experimentation authorized by the state] dramatizes the notion that the state is free to treat its nationals in the manner it chooses because it perceives itself as the source of all rights, and therefore as beyond the reach of law, rather than regarding rights as inalienable, that is, not subject to arbitrary cancellation by the State." Bassiouni, Baffes, & Evrard, An Appraisal of Human Experimentation in International Law and Practice: The Need for International Regulation of Human Experimentation, 72 J. of Crim. L. & C. 1597, 1607 (1981).

In the 1950's, in defiance of this principle, military intelligence agencies and the Central Intelligence Agency (CIA) began surreptitiously testing chemical and biological materials, including LSD. These programs, which were "designed to determine the potential effects of chemical or biological agents when used operationally against individuals unaware that they had received a drug," included drug testing on "unwitting, nonvolunteer" Americans. S. Rep. No. 94–755, Book I, p. 385 (1976) (S. Rep.).[3] James B. Stanley, a master sergeant in the Army, alleges that he was one of 1,000 soldiers covertly administered LSD by Army Intelligence between 1955 and 1958. See id., at 392.[4]

The Army recognized the moral and legal implications of its conduct. In a 1959 Staff Study, the United States Army Intelligence Corps (USAINTC) discussed its covert administration of LSD to soldiers:

"'It was always a tenet of Army Intelligence that the basic American principle of dignity and welfare of the individual will not be violated. . . . In intelligence, the stakes involved and the interests of national security may permit a more tolerant interpretation of moral-ethical values, but not legal limits, through necessity. . . . Any claim against the US Government for alleged injury due

---

[3] This massive Senate Report is the product of a select Committee which "conduct[ed] an investigation and study of governmental operations with respect to intelligence activities and of the extent, if any, to which illegal, improper, or unethical activities were engaged in by any agency of the Federal Government." S. Rep., at 2. The Committee's function was "to illustrate the problems before Congress and the country." Id., at 5. Significantly, the Report added that "[t]he Justice Department and the courts in turn have their proper roles to play." Ibid.

[4] The intelligence community believed that it was necessary "to conceal these activities from the American public in general," because public knowledge of the "unethical and illicit activities would have serious repercussions in political and diplomatic circles and would be detrimental to the accomplishment of its mission." Id., at 394 (quoting CIA Inspector General's Survey of the Technical Services Division, p. 217 (1957)).

to EA 1729 [LSD] must be legally shown to have been due to the material. Proper security and appropriate operational techniques can protect the fact of employment of EA 1729.'" *Id.*, at 416–417 (quoting USAINTC Staff Study, Material Testing Program EA 1729, p. 26 (Oct. 15, 1959)).

That is, legal liability could be avoided by covering up the LSD experiments.

When the experiments were uncovered, the Senate agreed with the Army's conclusion that its experiments were of questionable legality, and issued a strong condemnation:

"[I]n the Army's tests, as with those of the CIA, individual rights were . . . subordinated to national security considerations; informed consent and follow-up examinations of subjects were neglected in efforts to maintain the secrecy of the tests. Finally, the command and control problems which were apparent in the CIA's programs are paralleled by a lack of clear authorization and supervision in the Army's programs." S. Rep., at 411.[5]

Having invoked national security to conceal its actions, the Government now argues that the preservation of military discipline requires that Government officials remain free to violate the constitutional rights of soldiers without fear of money damages. What this case and others like it demonstrate, however, is that Government officials (military or civilian) must not be left with such freedom. See, *e. g., Jaffee* v. *United States*, 663 F. 2d 1226 (CA3 1981) (en banc) (exposure of soldiers to nuclear radiation during atomic weapons testing); *Schnurman* v. *United States*, 490 F. Supp. 429 (ED

---

[5] See also S. Rep., at 403:

"Though it was known that the testing was dangerous, the lives of subjects were placed in jeopardy and their rights were ignored during the ten years of testing which followed Dr. Olsen's death. [Dr. Olsen, a civilian employee of the Army, committed suicide after being administered LSD without his knowledge.] Although it was clear that the laws of the United States were being violated, the testing continued."

Va. 1980) (exposure of unknowing soldier to mustard gas); *Thornwell* v. *United States*, 471 F. Supp. 344 (DC 1979) (soldiers used to test the effects of LSD without their knowledge); cf. *Barrett* v. *United States*, No. 76 Civ. 381 (SDNY, May 5, 1987) (death of mental hospital patient used as the unconsenting subject of an Army experiment to test mescaline derivative).[6]

## II

Serious violations of the constitutional rights of soldiers must be exposed and punished. Of course, experimentation with unconsenting soldiers, like any constitutional violation, may be enjoined *if* and when discovered. An injunction, however, comes too late for those already injured; for these victims, "it is damages or nothing." *Bivens*, 403 U. S., at 410 (Harlan, J., concurring). The solution for Stanley and

---

[6] In *Jaffee* v. *United States*, 663 F. 2d 1226 (CA3 1981), a former enlisted member of the Army sought damages arising from injuries received in 1953 at Camp Desert Rock, Nevada, where his commanding officers ordered him and thousands of other soldiers to stand unprotected from nuclear radiation while an atomic bomb was exploded nearby. Jaffee developed inoperable cancer in 1977 and alleged that the radiation exposure was the cause.

Between 1945 and 1963, an estimated 250,000 military personnel were exposed to large doses of radiation while engaged in maneuvers designed to determine the effectiveness of combat troops in nuclear battlefield conditions. Veterans'. Claims for Disabilities from Nuclear Weapons Testing: Hearing before the Senate Committee on Veterans Affairs, 96th Cong., 1st Sess., 2 (1979). Soldiers were typically positioned one to three miles from nuclear detonation. They were issued no protective clothing (although Atomic Energy Commission personnel were) and were not warned as to the possible dangers of radiation. They were instructed to cover their eyes at detonation; "soldiers with their eyes shut could see the bones in their forearms at the moment of the explosion." Schwartz, Making Intramilitary Tort Law More Civil: A Proposed Reform of the *Feres* Doctrine, 95 Yale L. J. 992, 994, n. 16 (1986) (discussing firsthand accounts in T. Saffer & O. Kelly, Countdown Zero 43, 75, 152 (1982)). The exposed servicemembers have been disproportionately likely to be afflicted with inoperable cancer and leukemia, as well as a number of nonmalignant disorders.

other soldiers, as for any citizen, lies in a *Bivens* action—an action for damages brought directly under the Constitution for the violation of constitutional rights by federal officials. But the Court today holds that no *Bivens* remedy is available for service-connected injuries, because "special factors counse[l] hesitation." *Id.*, at 396. The practical result of this decision is absolute immunity from liability for money damages for all federal officials who intentionally violate the constitutional rights of those serving in the military.

First, I will demonstrate that the Court has reached this result only by ignoring governing precedent. The Court confers absolute immunity from money damages on federal officials (military and civilian alike) without consideration of longstanding case law establishing the general rule that such officials *are* liable for damages caused by their intentional violations of well-established constitutional rights. If applied here, that rule would require a different result. Then I will show that the Court denies Stanley's *Bivens* action solely on the basis of an unwarranted extension of the narrow exception to this rule created in *Chappell* v. *Wallace*, 462 U. S. 296 (1983). The Court's reading of *Chappell* tears it from its analytical moorings, ignores the considerations decisive in our immunity cases, and leads to an unjust and illogical result.

## A

The Court acknowledges that Stanley may bring a *Bivens* action for damages under the Constitution unless there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Bivens, supra*, at 396. Ascertaining the propriety of a damages award is the purpose of both the *Bivens* "special factors" analysis and the inquiry into whether these federal officials are entitled to absolute immunity from money damages.[7] As a practical

---

[7] The Court made clear in *Davis* v. *Passman*, 442 U. S. 228, 244 (1979), that the question whether a plaintiff has a cause of action under the Constitution is different from the question whether that plaintiff is entitled to

matter, the immunity inquiry and the "special factors" inquiry are the same; the policy considerations that inform them are identical, and a court can examine these considerations only once.[8]

In *Davis* v. *Passman*, 442 U. S. 228 (1979), the Court explicitly acknowledged that the immunity question and the "special factors" question are intertwined. The Court recognized that "a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation" under *Bivens*, but held that "these concerns are coextensive with the protections afforded by the Speech or Debate Clause," *id.*, at 246, which "shields federal legislators with absolute immunity," *id.*, at 236, n. 11.[9] Absent immunity, the Court said, legislators ought to be liable in damages, as are ordinary persons. See *id.*, at 246. The same analysis applies to federal officials making decisions in military matters. Absent immunity, they are liable for damages, as are all citizens.

---

damages if he or she prevails on the merits. The latter is the relevant inquiry when a *Bivens* claim is made. Of course, if the plaintiff fails either to plead a cause of action or to demonstrate the damages are appropriate as a matter of law, the complaint is dismissed under Federal Rule of Civil Procedure 12(b)(6). In the first instance, the complaint is dismissed for "failure to state a claim," while in the latter instance, the complaint is dismissed because it is not one "upon which relief can be granted."

[8] The Court has acknowledged that the damages remedy made available in *Bivens* would be "drained of meaning if federal officials were entitled to absolute immunity for their constitutional transgressions," because "a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs." *Butz* v. *Economou*, 438 U. S. 478, 501, 505 (1978) (internal quotation omitted).

[9] The Court in *Davis*, *supra*, did not decide whether Passman was absolutely immune from damages, but instead remanded the action to the Court of Appeals for a determination of that question. Analytically, the Court therefore postponed decision on the propriety of damages until a lower court could ascertain whether immunity, a "special factor," shielded Passman from damages.

As the Court notes, I do not dispute that the question whether a *Bivens* action exists is "analytically distinct from the question of official immunity from *Bivens* liability." *Ante*, at 684. I contend only that the "special factors" analysis of *Bivens* and the functional analysis of immunity are based on identical judicial concerns which, when correctly applied, should not and do not (as either a logical or practical matter) produce different outcomes. JUSTICE STEVENS explained it well:

> "The practical consequences of a holding that no remedy has been authorized against a public official are essentially the same as those flowing from a conclusion that the official has absolute immunity. Moreover, similar factors are evaluated in deciding whether to recognize an implied cause of action or a claim of immunity. In both situations, when Congress is silent, the Court makes an effort to ascertain its probable intent." *Mitchell* v. *Forsyth*, 472 U. S. 511, 538–539 (1985) (concurring opinion).

Thus, the redundance which so troubles the Court in equation of the "special factors" analysis and the immunity analysis strikes me as evidence only that the analyses are being properly performed. And *Davis* cannot be characterized, as the Court asserts, as a *unique* case in which the "special factors" of *Bivens* were coextensive with the immunity granted.[10]

---

[10] The Court does not provide an example of a situation in which the *Bivens* inquiry and the immunity inquiry might reach contrary conclusions. Of course, I cannot produce "any *reason* for creating" an equivalency between the two analyses as to this particular case. *Ante*, at 685. Neither I nor the Court has any idea what functions were performed by the petitioner officials, so I cannot argue that the considerations militating in favor of qualified immunity here also militate in favor of permitting a cause of action.

When performing the *Bivens* analysis here, therefore, the Court should examine our cases discussing immunity for federal officials.[11]

## B

The Court historically has conferred absolute immunity on officials who intentionally violate the constitutional rights of citizens only in extraordinary circumstances. Qualified immunity (that is, immunity for acts that an official did not know, or could not have known, violated clearly established constitutional law) "represents the norm." See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 807 (1982) (Presidential aides); *Mitchell, supra* (United States Attorney General); *Butz* v. *Economou*, 438 U. S. 478 (1978) (Cabinet officers).[12]

In *Butz*, we balanced "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority," *id.*, at 506, against the crucial importance of a damages remedy in deterring federal officials from committing con-

---

[11] The Court's use of the doctrine of *Feres* v. *United States*, 340 U. S. 135 (1950), in its analysis of soldiers' *Bivens* actions reveals the connection between the "special factors" inquiry and the absolute immunity inquiry. In *Feres*, the Court decided that, in the FTCA, Congress had not waived sovereign immunity from damages for claims arising out of negligent acts of federal officials causing service-connected injury. When, as here, the Court decides whether a *Bivens* action exists, it necessarily decides whether the policies underlying *Feres* alter the usual rule of qualified immunity for federal officials. In both cases the question is how policies underpinning *Feres* affect immunity from money damages.

[12] The President, see *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982), prosecutors, *Imbler* v. *Pachtman*, 424 U. S. 409 (1976), and federal officials with prosecutorial and adjudicative functions, see *Butz, supra*, at 508–517, possess absolute immunity from damages actions arising from the violation of clearly established constitutional rights. But most public servants receive qualified, rather than absolute, immunity. See *Procunier* v. *Navarette*, 434 U. S. 555 (1978) (prison officials); *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975) (state hospital administrators); *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974) (state executive officers); *Pierson* v. *Ray*, 386 U. S. 547 (1967) (police).

stitutional wrongs and vindicating the rights of citizens, *id.*, at 504–505.[13] After full consideration of potential adverse consequences, we decided that the extension of absolute immunity to federal officials would "seriously erode the protection provided by basic constitutional guarantees," *id.*, at 505, and undermine the basic assumption of our jurisprudence: "that all individuals, *whatever their position in government,* are subject to federal law." *Id.*, at 506 (emphasis added). Thus, we concluded that it is "not unfair to hold liable the official who knows or should know he is acting outside the law," and that "insisting on awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment." *Id.*, at 506–507.

In *Butz* we acknowledged that federal officials may receive absolute immunity in the exercise of certain functions, but emphasized that the burden is on the official to demonstrate that an "exceptional situatio[n]" exists, in which "absolute immunity is *essential* for the conduct of the public business." See *Butz, supra,* at 507; *Harlow,* 457 U. S., at 812. The official seeking immunity "first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability," and "then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted." *Id.*, at 813.

Even when, as here, national security is invoked,[14] federal officials bear the burden of demonstrating that the usual rule

---

[13] Qualified immunity for executive officials is the result of the balancing of "fundamentally antagonistic social policies." *Barr* v. *Mateo,* 360 U. S. 564, 576 (1959) (plurality opinion). Civil damages compensate victims of wrongdoing and deter tortious conduct, while immunity encourages participation in government, allows courageous action in public service, and provides officials with the freedom to concentrate on their public responsibilities.

[14] The Government suggests that federal officers and agents gave LSD to Stanley and 1,000 other soldiers "for the purpose of 'ascertain[ing] the effects of the drug on their ability to function as soldiers' and 'to evaluate

of qualified immunity should be abrogated. In *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985), the Court found "no . . . historical or common-law basis for an absolute immunity for officers carrying out tasks essential to national security." *Id.*, at 521. In language applicable here, the Court pointed out: "National security tasks . . . are carried out in secret . . . . Under such circumstances, it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation." *Id.*, at 522.[15] The Court highlighted the "danger that high federal officials will disregard constitutional rights in their zeal to protect the national security," and deemed it "sufficiently real to counsel against affording such officials an absolute immunity." *Id.*, at 523.

This analysis of official immunity in the national security context applies equally to officials giving orders to the military. In *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), the Governor, the Adjutant General of the Ohio National Guard, and other National Guard officers were sued under 42 U. S. C. § 1983 for damages arising from injuries suffered when the Guard was deployed and ordered to fire its guns during a civil disturbance. The Court awarded only qualified immunity to the highest military officer of the State—the Governor (who commanded the State National Guard)—and to executive and military officers involved in the decision to take military

---

the validity of the traditional security training . . . in the face of unconventional, drug enhanced interrogations.'" Brief for United States 3, n. 1 (quoting S. Rep. 411–412).

[15] Again in analysis equally applicable here, the Court observed that most officials who receive absolute immunity from suits for damages with regard to certain functions are subject to other checks "that help to prevent abuses of authority from going unredressed." 472 U. S., at 522 (legislators are accountable to their constituents, and the judicial process is theoretically self-correcting by appellate review). But "[s]imilar built-in restraints on the Attorney General's activities in the name of national security . . . do not exist." *Id.*, at 523.

action.[16] *Scheuer* demonstrates that executive officials may receive only qualified immunity even when the function they perform is military decisionmaking.[17]

Whoever the officials in this case are (and we do not know), and whatever their functions, it is likely that under the Court's usual analysis, they, like most Government officials, are not entitled to absolute immunity. The record does not reveal what offices the individual petitioners held, let alone what functions they normally performed, or what functions they were performing at the time they (somehow) participated in the decision to administer LSD to Stanley (and 1,000 other soldiers). The Court has no idea whether those officials can carry "the burden of showing that public policy requires [absolute immunity]" for effective performance of those functions. *Butz*, 438 U. S., at 506. Yet the Court grants them absolute immunity, so long as they intentionally inflict only service-connected injuries, doing violence to the principle that "extension of absolute immunity from damages liabil-

---

[16] See also *Butz*, 438 U. S., at 491–492 (In finding qualified immunity for federal officials, the Court relied in part upon "a case involving military discipline, [in which] the Court issued a similar ruling [authorizing immunity absent willful or malicious conduct]"); Burgess, Official Immunity and Civil Liability for Constitutional Torts Committed by Military Commanders After *Butz* v. *Economou*, 89 Mil. L. Rev. 25, 46–47 (1980) (reading *Butz* to militate against intramilitary immunity in suits alleging constitutional violations).

[17] *Chappell* v. *Wallace*, 462 U. S. 296 (1983), which I discuss in detail *infra*, at 700–707, is not to the contrary. There the Court found that a "special factor"—the need for effective performance of active duty command—entitled military officers to absolute immunity from damages for injuries inflicted upon direct subordinates. Relying on the "special nature of military life—the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel"—the Court decided that the military command function "would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command." *Id.*, at 304. The unique requirements of intramilitary authority drove the Court in *Chappell;* those concerns do not govern here, where we address the immunity of officials whose relationship with Stanley is unknown.

ity to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees." *Id.*, at 505. The case should be remanded and petitioners required to demonstrate that absolute immunity was necessary to the effective performance of their functions.

## C

It is well accepted that when determining whether and what kind of immunity is required for Government officials, the Court's decision is informed by the common law. See *Nixon* v. *Fitzgerald,* 457 U. S. 731, 747 (1982); *Mitchell, supra,* at 521; *Butz, supra,* at 508. My conclusion that qualified, rather than absolute, immunity is the norm for Government officials, even in cases involving military matters, is buttressed by the common law.

At common law, even military superiors received no exemption from the general rule that officials may be held accountable for their actions in damages in a civil court of law.[18] "[T]he English judiciary refused to adopt absolute immunity as an essential protection of [intramilitary] discipline,"[19] and "[t]he original American decisions in intramilitary cases [also]

---

[18] See W. Winthrop, Military Law and Precedents 880–885 (2d ed. 1920) (collecting decisions in which servicemembers sued their superiors for the intentional torts of libel, malicious prosecution, false imprisonment, and other service-related injuries). The Winthrop treatise reveals that military officers had only a defense of an absence of malice respecting actions within the scope of their authority, a defense closely resembling qualified immunity.

[19] Some English cases do suggest absolute immunity for intramilitary torts. See *Sutton* v. *Johnstone,* 1 T. R. 492, 99 Eng. Rep. 1215, 1246 (K. B. 1786) (dictum); *Dawkins* v. *Lord Rokeby,* 4 F. & F. 806, 841, 176 Eng. Rep. 800, 815 (N. P. 1866); *Dawkins* v. *Lord Paulet,* L. R. 5 Q. B. 94, 115 (1869). But there is strong authority on the other side, and, before the question became the subject of statutory law, see Crown Proceedings Act, 1947, 10 & 11 Geo. 6, ch. 44, the English courts considered the matter unresolved. See *Fraser* v. *Balfour,* 87 L. J. K. B. 1116, 1118 (1918) (court observed that the question of immunity in intramilitary torts was "still open").

adopted a qualified immunity in intentional tort cases." Zillman, Intramilitary Tort Law: Incidence to Service Meets Constitutional Tort, 60 N. C. L. Rev. 489, 498, 499 (1982).[20] The best-known American case is *Wilkes* v. *Dinsman*, 7 How. 89 (1849), after remand, *Dinsman* v. *Wilkes*, 12 How. 390 (1852). In that case, this Court permitted a Navy seaman to bring a claim against his superior officer for injuries resulting from willful torts. Although the Court suggested that the commander was entitled to a jury charge providing some immunity, it refused to confer absolute immunity from liability for intentional torts:

> "It must not be lost sight of . . . that, while the chief agent of the government, in so important a trust, when conducting with skill, fidelity, and energy, is to be protected under mere errors of judgment in the discharge of his duties, yet he is not to be shielded from responsibility if he acts out of his authority or jurisdiction, or inflicts private injury either from malice, cruelty, or any species of oppression, founded on considerations independent of public ends.

> "The humblest seaman or marine is to be sheltered under the aegis of the law from any real wrong, as well as the highest in office." 7 How., at 123.[21]

As noted above, the Court subsequently used *Wilkes* as an example of the usual practice of affording only qualified im-

---

[20] See, *e. g.*, *Wilson* v. *MacKenzie*, 7 Hill 95 (N. Y. Sup. Ct. 1845) (citing cases) (naval officer was sued for the beating and imprisonment of an enlisted man; court rejected defense of absolute immunity, stating that English courts had allowed suits for acts done under the rubric of military discipline); *Maurice* v. *Worden*, 54 Md. 233 (1880) (professor at the United States Naval Academy sued his superior officers for libel; state court rejected defense of absolute immunity).

[21] See also *Dinsman* v. *Wilkes*, 12 How. 390, 403 (1852) (although discipline may be endangered by civil damages suits, the Nation will be dishonored if a servicemember can "be oppressed and injured by his commanding officer, from malice or ill-will, or the wantoness of power, without giving him redress in the courts of justice").

munity to government officials. See *Butz*, 438 U. S., at 491. In addition, in *Chappell* v. *Wallace*, 462 U. S., at 305, n. 2, the Court distinguished *Wilkes*, plainly indicating that *Chappell* did *not* hold that soldiers could never sue for service-connected injury inflicted by an intentional tort. Indeed, by preserving *Wilkes*, the Court suggested that even military officials would not always be absolutely immune from liability for such conduct.

Although *Chappell* reveals that we have moved away from the common-law rule in cases involving the command relationship between soldiers and their superiors, our immunity cases and a close analysis of *Chappell*, see *infra* this page and 701–707, reveal that there is no justification for straying further.

### III

### A

In *Chappell* the Court created a narrow exception to the usual rule of qualified immunity for federal officials. Repeatedly referring to the "'peculiar and special relationship of the soldier to his superiors,'" and to the need for "immediate compliance with military procedures and orders," the Court held that "enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations." 462 U. S., at 300, 305 (quoting *United States* v. *Brown*, 348 U. S. 110, 112 (1954)).[22] Although the Court concedes this central focus of *Chappell*, it gives short shrift to the obvious and important distinction be-

---

[22] The Court concedes that "Stanley and the lower courts may well be correct that *Chappell* implicates military chain-of-command concerns more directly than do the facts alleged here," and that in *Chappell* we "explicitly focus[ed] on the officer-subordinate relationship that existed in [that] case," using language that "would not be applicable here." *Ante*, at 680. For example, we highlighted the need for "special regulations in relation to military discipline" and the "hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and *wholly different from civilian patterns*," *Chappell*, 462 U. S., at 300 (emphasis added).

tween *Chappell* and the present case, namely, that the defendants are not alleged to be Stanley's superior officers. Instead the Court seizes upon the statement in *Chappell* that our analysis in that case was guided by the concerns underlying the *Feres* doctrine, and dramatically expands the carefully limited holding in *Chappell*, extending its reasoning beyond logic and its meaning beyond recognition.

The Court reasons as follows: In *Chappell* we stated that the concern for "military discipline" underlying the *Feres* doctrine would guide our analysis of the soldiers' *Bivens* claims against their superior officers. 462 U. S., at 299. In *United States* v. *Johnson*, 481 U. S. 681 (1987), we held that the concerns underlying the *Feres* doctrine precluded a soldier's FTCA claim for service-connected injury, even against civilian federal officials. Thus, the Court concludes, the concerns underlying the *Feres* doctrine preclude Stanley's *Bivens* action for service-connected injury against civilian federal officials.

This argument has a number of flaws. First, in *Chappell* we said with good reason that our analysis would be "guided," not governed, by concerns underlying *Feres*. The *Bivens* context differs significantly from the FTCA context; *Bivens* involves not negligent acts, but intentional constitutional violations that must be deterred and punished. Because *Chappell* involved the relationship at the heart of the *Feres* doctrine—the relationship between soldier and superior—the Court found *Feres* considerations relevant, and provided direct military superiors with absolute immunity from damages actions filed by their subordinates. Here, however, the defendants are federal officials who perform *unknown* functions and bear an *unknown* relationship to Stanley. Thus, we must assure ourselves that concerns underlying the *Feres* doctrine actually *do* require absolute immunity from money damages before we take the drastic step of insulating officials from liability for intentional constitutional violations. This the Court utterly fails to do.

Second, two of the three *Feres* rationales that decided *Johnson, supra,* are entirely inapplicable here.[23]   Thus, the Court relies solely upon the third *Feres* rationale—a solicitude for military discipline.   The *Feres'* concern for military discipline itself has three components.   The first, the concern for the instinctive obedience of soldiers to orders, is of central importance in the *Feres* doctrine.[24]   That rationale profoundly and exclusively concerned the Court in *Chappell* which involved the relationship between a superior officer and those in his or her command.[25]   This concern for instinc-

---

[23] First, in *Feres* the Court feared that allowing FTCA recovery, which varies from State to State, would impinge upon the military's need for uniformity.   In contrast, *Bivens* actions are governed by uniform federal law. Second, the "swift," "efficient," and "generous statutory disability and death benefits" of the Veterans' Benefits Act (VBA), 72 Stat. 1118, as amended, 38 U. S. C. § 301 *et seq.*, constitute "an independent reason why the *Feres* doctrine bars suit for service-related injuries." *United States* v. *Johnson,* 481 U. S. 681, 689 (1987).   But the VBA fails to address the violation of constitutional rights unaccompanied by personal injury that is not defined as disabling.   Those whose constitutional rights are infringed, resulting in humiliation or "in mere pain and suffering, but no lasting permanent physical injury, would not be compensated at all."   Donaldson, Constitutional Torts and Military Effectiveness: A Proposed Alternative to the *Feres* Doctrine, 23 A. F. L. Rev. 171, 198–199 (1982–1983).

[24] In *Johnson, supra,* when the Court extended the application of *Feres* to preclude suits for service-connected injuries against civilian officials, the Court did not refer to, or rely upon, *Feres'* concern with obedience to orders.   Of course, this aspect of military discipline would not be implicated in *Johnson,* or in any cases involving tortious conduct by a civilian official. But in *Johnson,* two of the three major rationales underlying *Feres*—the concern for uniformity and the congressional provision of thoroughgoing compensation—were relevant.   Neither of these rationales applies here. See n. 22, *supra.*

[25] Stanley points out that he was administered LSD without his knowledge so that he could not have disobeyed any order given him.   Had his military superior surreptitiously administered the LSD to him, this fact alone might distinguish a suit for damages against that official from the suit in *Chappell.*   Here, however, the fact that the LSD was given Stanley without his knowledge simply removes the case one step further from

tive obedience is not at all implicated where a soldier sues civilian officials.[26]

As for the other components of the concern for military discipline, their application is entirely different in the *Bivens* context. The Court fears that military affairs might be disrupted by factual inquiries necessitated by *Bivens* actions. The judiciary is already involved, however, in cases that implicate military judgments and decisions, as when a soldier sues for nonservice-connected injury, when a soldier sues civilian contractors with the Government for service-connected injury, and when a civilian is injured and sues a civilian contractor with the military or a military tortfeasor. See *John-*

---

the concern for obedience to orders that the Court chose to protect in *Chappell.*

[26] I do not mean to imply that *Chappell* suggests that *Bivens* actions against military officials *other than* direct superiors are precluded. Criticisms of the blanket application of *Feres* in the *Bivens* context have equal force in the context of intentional intramilitary torts that do not involve the direct chain of command. "The policy argument for absolute immunity . . . rests on the dubious proposition that a serviceman is more likely to respect authority when he has no recourse for the intentional or malicious deprivation of his constitutional rights. The contrary argument—that safeguarding rights compatible with military needs will engender respect for authority and promote discipline—is more appealing." Note, Intramilitary Immunity and Constitutional Torts, 80 Mich. L. Rev. 312, 328 (1981). Cf. *Johnson, supra,* at 700 (SCALIA, J., dissenting) ("Or perhaps—most fascinating of all to contemplate—Congress thought that *barring* recovery by servicemen might adversely affect military discipline").

Nor does the military view the authority intentionally to violate the constitutional rights of soldiers as essential to its mission. See Uniform Code of Military Justice (UCMJ), 10 U. S. C. §§ 938, 939, discussed *infra,* at n. 27. Moreover, the military does not require instinctive or reflexive obedience of the soldier in all contexts (combat being the obvious counterexample). Soldiers are subject to criminal sanctions if they *obey* certain orders. See *United States* v. *Calley,* 22 U. S. C. M. A. 534, 48 C. M. R. 19 (1973) (obedience to orders no defense where defendant should have known that order to kill civilians was illegal); *United States* v. *Kinder,* 14 C. M. R. 742 (USAF Ct. Mil. Rev. 1954) (obedience to orders no defense for soldier who executed order to shoot subdued prisoner at South Korean air base).

*son*, 481 U. S., at 700 (SCALIA, J., dissenting).[27] Although the desire to *limit* the number of such cases might justify the decision not to allow soldiers' FTCA suits arising from *negligent* conduct by civilian Government employees, see *United States* v. *Johnson, supra,* it is insufficient to preclude suits against civilians for *intentional* violations of constitutional rights. Unless the command relationship (or some other consideration requiring absolute immunity) is involved, these violations should receive moral condemnation and legal redress without limitation to that accorded negligent acts.

Finally, the Court fears that the vigor of military decisionmaking will be sapped if damages can be awarded for an incorrect (albeit intentionally incorrect) choice. Of course, this case involves civilian decisionmakers, but because the injury was service connected, we must assume that these civilian judgments are somehow intertwined with conduct of the military mission. See *Johnson, supra,* at 691. The significant difference between the *Feres* (FTCA) and *Bivens* (constitutional claim) contexts, however, is that, in the latter, the vigorous-decisionmaking concern has already been taken into account in our determination that qualified immunity is the general rule for federal officials, who *should* be required "on occasion . . . to pause to consider whether a proposed course of action can be squared with the Constitution." *Mitchell*, 472 U. S., at 524. The special requirements of com-

---

[27] In addition, judicial involvement occurs when courts review court-martial proceedings (through federal habeas corpus jurisdiction), see *Burns* v. *Wilson,* 346 U. S. 137, 142 (1953), when the Court of Claims reviews cases involving interference with military career advantage, see 28 U. S. C. § 1491, and when soldiers bring claims for injunctive and declaratory relief from statutory and constitutional violations. See also UCMJ, 10 U. S. C. § 938 (providing complaint procedure for "[a]ny member of the armed forces who believes himself wronged by his commanding officer"); § 939 (providing procedure for damages arising from willful damage to property of any soldier by another member of the Armed Services); *Colson* v. *Bradley,* 477 F. 2d 639 (CA8 1973) (judicial review of § 938 claim); *Cortright* v. *Resor,* 447 F. 2d 245 (CA2 1971) (same).

mand that concerned us in *Chappell* are not implicated in this case, and neither the Government nor the Court offers any plausible reason to extend absolute immunity to these civilian officials for their intentional constitutional violations.

In *Chappell*, the Court did not create an inflexible rule, requiring a blind application of *Feres* in soldiers' cases raising constitutional claims. Given the significant interests protected by *Bivens* actions, the Court must consider a constitutional claim in light of the concerns underlying *Feres*. If those concerns are not implicated by a soldier's constitutional claim, *Feres* should not thoughtlessly be imposed to prevent redress of an intentional constitutional violation.[28]

The Court decides that here (as indeed in any case) one might select a higher level of generality for the *Chappell* holding, and concludes that any *Bivens* action arising from a service-connected injury is foreclosed by "special factors counselling hesitation." *Bivens*, 403 U. S., at 396. The Court concedes that "[t]his is essentially a policy judgment," which depends upon "how much occasional, unintended impairment of military discipline one is willing to tolerate." *Ante*, at 681. But the Court need not make a policy judgment; in our immunity cases we have an established legal framework within which to consider whether absolute immunity from money damages is required in any particular situa-

---

[28] The Court states that, in the FTCA context, it is theoretically "freer to compromise military concerns . . . since we were confronted with an explicit congressional authorization for judicial involvement that was, on its face, unqualified," while in the *Bivens* context, we "rely upon inference for our own authority to allow money damages." *Ante*, at 681–682. One could approach the question from an entirely different angle. The usual rule with regard to suing the United States is sovereign immunity, so the FTCA creates an exception to that rule which must be narrowly interpreted. The usual rule is individual accountability for injury done, and qualified immunity of federal officials represents a judge-made exception to that rule. Our decision to find "special factors" in a *Bivens* case and grant absolute immunity to federal officials with regard to a certain class of injuries represents a further and indefensible enlargement of a special status.

tion. Were I to concede that military discipline is somehow implicated by the award of damages for intentional torts against civilian officials (which I do not, see *supra*, at 702–703), I would nonetheless conclude, in accord with our usual immunity analysis, that the decisionmaking of federal officials deliberately choosing to violate the constitutional rights of soldiers *should be impaired.* I cannot comprehend a policy judgment that frees all federal officials from any doubt that they may intentionally, and in bad faith, violate the constitutional rights of those serving in the Armed Forces. The principles of accountability embodied in *Bivens*—that no official is above the law, and that no violation of right should be without a remedy—apply.

## B

The second "special factor" in *Chappell*—congressional activity "provid[ing] for the review and remedy of complaints and grievances such as those presented by" the injured soldier—is not present here. *Chappell*, 462 U. S., at 302.[29] The Veterans' Benefits Act is irrelevant where, as here, the injuries alleged stem (in large part) from pain and suffering in forms not covered by the Act. The UCMJ assists only when the soldier is on active duty and the tortfeasor is another military member. Here, in contrast to the situation in *Chappell*, no intramilitary system "provides for the . . . remedy" of Stanley's complaint. 462 U. S., at 302. See also *Bush* v. *Lucas*, 462 U. S. 367, 386, 388, 378, n. 14 (1983) (special factors counseling hesitation found because claims were "fully cognizable" within an "elaborate remedial system,"

---

[29] In *Chappell*, the Court makes plain that, standing alone, the "special nature of [the] military" would not have sufficed to confer absolute immunity upon military superiors for wrongs inflicted upon those in their command. It was the "unique disciplinary structure of the Military Establishment *and* Congress' activity in the field" that *"[t]aken together"* constituted those special factors precluding any damages award. 462 U. S., at 304 (emphasis added).

providing "comprehensive," "meaningful," and "constitutionally adequate" remedies).

Nonetheless, the Court finds Congress' activity (and inactivity) of particular significance here, because we are confronted with a constitutional authorization for Congress to "'make Rules for the Government and Regulation of the land and naval Forces.'" *Ante*, at 679 (quoting U. S. Const. Art. I, §8, cl. 14). First, the existence of a constitutional provision authorizing Congress to make intramilitary rules does not answer the question whether *civilian* federal officials are immune from damages in actions arising from service-connected injury. Second, *any time* Congress acts, it does so pursuant to either an express or implied grant of power in the Constitution. If a *Bivens* action were precluded any time Congress possessed a constitutional grant of authority to act in a given area, there would be no *Bivens*. In fact, many administrative agencies exist and function entirely at the pleasure of Congress, yet the Court has not hesitated to infer *Bivens* actions against these agencies' officials. This is so no matter how explicitly or frequently the Constitution authorizes Congress to act in a given area. Even when considering matters most clearly within Congress' constitutional authority, we have found that a *Bivens* action will lie. See *Davis* v. *Passman*, 442 U. S. 228 (1979).

In *Chappell* the Court found that both the imperatives of military discipline and the congressional creation of constitutionally adequate remedies for the alleged violations constituted "special factors counselling hesitation," and refused to infer a *Bivens* action. In this case, the invocation of "military discipline" is hollow, and congressional activity nonexistent; a *Bivens* action must lie.

## IV

"The soldier's case is instructive: Subject to most unilateral discipline, forced to risk mutilation and death, conscripted without, perhaps against, his will—he is still

conscripted with his capacities to act, to hold his own or fail in situations, to meet real challenges for real stakes. Though a mere 'number' to the High Command, he is not a token and not a thing. (Imagine what he would say if it turned out that the war was a game staged to sample observations on his endurance, courage, or cowardice.)" H. Jonas, Philosophical Reflections on Experimenting with Human Subjects, in Experimentation with Human Subjects 3 (P. Freund ed. 1969).

The subject of experimentation who has not volunteered is treated as an object, a sample. James Stanley will receive no compensation for this indignity. A test providing absolute immunity for intentional constitutional torts *only* when such immunity was essential to maintenance of military discipline would "take into account the special importance of defending our Nation without completely abandoning the freedoms that make it worth defending." *Goldman* v. *Weinberger*, 475 U. S. 503, 530–531 (1986) (O'CONNOR, J., dissenting). But absent a showing that military discipline is concretely (not abstractly) implicated by Stanley's action, its talismanic invocation does not counsel hesitation in the face of an intentional constitutional tort, such as the Government's experimentation on an unknowing human subject. Soldiers ought not be asked to defend a Constitution indifferent to their essential human dignity. I dissent.

JUSTICE O'CONNOR, concurring in part and dissenting in part.

I agree with both the Court and JUSTICE BRENNAN that James Stanley's cause of action under the Federal Tort Claims Act (FTCA), 28 U. S. C. § 2671 *et seq.*, should not have been reinstated by the Court of Appeals. I therefore join Part I of the Court's opinion. I further agree with the Court that under *Chappell* v. *Wallace*, 462 U. S. 296 (1983), there is generally no remedy available under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), for

injuries that arise out of the course of activity incident to military service. *Ante*, at 683–684. In *Chappell* v. *Wallace*, *supra*, this Court unanimously held that enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations. The "special factors" that we found relevant to the propriety of a *Bivens* action by enlisted personnel against their military superiors "also formed the basis" of this Court's decision in *Feres* v. *United States*, 340 U. S. 135 (1950), that the FTCA does not extend to injuries arising out of military service. *Chappell, supra,* at 298. In my view, therefore, *Chappell* and *Feres* must be read together; both cases unmistakably stand for the proposition that the special circumstances of the military mandate that civilian courts avoid entertaining a suit involving harm caused as a result of military service. Thus, no amount of negligence, recklessness, or perhaps even deliberate indifference on the part of the military would justify the entertainment of a *Bivens* action involving actions incident to military service.

Nonetheless, the *Chappell* exception to the availability of a *Bivens* action applies only to "injuries that 'arise out of or are in the course of activity incident to service.'" *Ante*, at 684 (quoting *Feres* v. *United States, supra,* at 146). In my view, conduct of the type alleged in this case is so far beyond the bounds of human decency that as a matter of law it simply cannot be considered a part of the military mission. The bar created by *Chappell*—a judicial exception to an implied remedy for the violation of constitutional rights—surely cannot insulate defendants from liability for deliberate and calculated exposure of otherwise healthy military personnel to medical experimentation without their consent, outside of any combat, combat training, or military exigency, and for no other reason than to gather information on the effect of lysergic acid diethylamide on human beings.

No judically crafted rule should insulate from liability the involuntary and unknowing human experimentation alleged

to have occurred in this case. Indeed, as JUSTICE BRENNAN observes, the United States military played an instrumental role in the criminal prosecution of Nazi officials who experimented with human subjects during the Second World War, *ante,* at 687, and the standards that the Nuremberg Military Tribunals developed to judge the behavior of the defendants stated that the "voluntary consent of the human subject is absolutely essential . . . to satisfy moral, ethical and legal concepts." *United States* v. *Brandt* (The Medical Case), 2 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, p. 181 (1949). If this principle is violated the very least that society can do is to see that the victims are compensated, as best they can be, by the perpetrators. I am prepared to say that our Constitution's promise of due process of law guarantees this much. Accordingly, I would permit James Stanley's *Bivens* action to go forward, and I therefore dissent.