Jane J. SMITH, Executrix of the Estate of Michael J. Smith, Plaintiff,

v.

MORTON THIOKOL, INC., et al. Defendants.

No. 87–398–CIV–ORL–19.

United States District Court, M.D. Florida, Orlando Division.

Feb. 22, 1988.

---

G. Gray Wilson, W.F. Maready, Petree, Stockton & Robinson, Winston–Salem, N.C. Trial Counsel and Leon H. Handley, Gurney & Handley, Orlando, Fla., for plaintiff.

Gary W. Allen, Larry L. Gregg, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Kendell W. Wherry, Asst. U.S. Atty., Orlando, Fla., Thomas M. Burke, Rumberger, Kirk Caldwell, Cabaniss, Burke & Wechsler, Orlando, Fla., and John W. Adler, Adler, Kaplan & Begy, Chicago, Ill., for defendants.

## ORDER

FAWSETT, District Judge.

This case comes before the Court upon the Motion to Dismiss of Defendant United States of America, and Memorandum in support thereof, filed June 19, 1987 (Doc. No. 17), and Memorandum in Opposition to Defendant United States of America's Motion to Dismiss, filed July 2, 1987 (Doc. No. 32); Federal Defendants' Motion to File Supplemental Memorandum in Support of Motions to Dismiss, and Memorandum in support thereof, filed July 15, 1987 (Doc. No. 36); and Memorandum in Response to Supplemental Memorandum of Defendants United States of America and Lawrence B. Mulloy, filed July 23, 1987 (Doc. No. 40).

Federal Defendants' Motion to File Supplemental Memorandum in Support of Motions to Dismiss (Doc. No. 36) is hereby GRANTED. Accordingly, the Supplemental Memorandum in Support of the Federal Defendants' Motions to Dismiss and Plaintiff's Memorandum in response thereto have been considered by the Court in reaching its determination on the Defendant United States of America's Motion to Dismiss.

Plaintiff's late husband, Commander Michael J. Smith, was killed aboard the space shuttle Challenger when it exploded during flight on January 28, 1986. Plaintiff, Jane J. Smith, is the executrix of her late husband's estate. On May 6, 1986, Plaintiff filed a six-count Complaint in this Court

seeking damages from Defendants, Morton Thiokol, Inc., the United States of America, and Lawrence B. Mulloy. Plaintiff's Complaint also seeks injunctive relief against Defendants Thiokol and United States.

■ In the Motion presently before this Court, Defendant United States seeks dismissal of Plaintiff's Complaint insofar as it asserts claims against the United States pursuant to the Federal Tort Claims Act [FTCA] on the ground that these claims are barred by the doctrine established in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In *Feres,* the United States Supreme Court held that "... the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to the service." [1] *Id.* at 146, 71 S.Ct. at 159. Although the vitality of the *Feres* doctrine has been questioned in the past, its holding was reaffirmed last year by the Supreme Court in *United States v. Johnson,* 481 U.S. 681, 107 S.Ct. 2063, 2069, 95 L.Ed.2d 648 (1987), wherein the doctrine was applied to bar claims filed on behalf of a deceased serviceman who was killed during activity incident to service. [2]

Three rationales underlie the *Feres* doctrine. First, the distinctively federal character of the relationship between the Government and Armed Forces personnel necessitates a federal remedy that provides simple, certain, and uniform compensation, unaffected by the fortuity of the situs of the alleged negligence. Second, because those injured during the course of activity incident to service receive generous statu-

tory veterans' disability and death benefits, it is unlikely that Congress intended to include them within the scope of FTCA coverage. Third, a suit based upon service-related activity involves the courts "in sensitive military affairs at the expense of military discipline and effectiveness." *Johnson,* 107 S.Ct. at 2063 (quoting *United States v. Shearer,* 473 U.S. 52, 59, 105 S.Ct. 3039, 3044, 87 L.Ed.2d 38 (1985)). To determine whether a claim is barred by *Feres,* this Court must consider all three rationales and apply each of them to the facts of this case. *Del Rio v. United States,* 833 F.2d 282, 286 (11th Cir.1987). When a case falls within the bounds of *Feres,* the Court has no jurisdiction to hear the case. *Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1157 (5th Cir.1981); *see Atkinson v. United States,* 825 F.2d 202, 204 n. 2 (9th Cir.1987).

The critical issue with respect to the Government's Motion to Dismiss involves what Plaintiff refers to as the "touchstone" of the *Feres* doctrine: whether Commander Smith was, at the time of his death, "performing activities incident to his federal service." *Johnson,* 107 S.Ct. at 2068. Plaintiff contends that Commander Smith was killed during an activity that was not incident to his service, and, therefore, Plaintiff's claims are not barred by the *Feres* doctrine.

In *Parker v. United States,* 611 F.2d 1007 (5th Cir.1980), the Fifth Circuit Court of Appeals set forth a three-part test for determining whether the activity of a serviceman was "incident to service" for pur-

1. The *Feres* doctrine is a judicially created exception to the waiver of sovereign immunity contained in the FTCA, 28 U.S.C. § 2674 (the United States is liable in tort "in the same manner and to the same extent as a private individual under like circumstances").

2. In *Johnson,* the widow of a Coast Guard helicopter pilot brought a wrongful death action against the United States pursuant to the FTCA, alleging that the negligence of an air traffic controller of the Federal Aviation Authority, a civilian agency of the federal government, had caused the crash in which her husband died. Relying on *Feres,* the district court dismissed the suit. The Eleventh Circuit Court of Appeals

reversed, distinguishing *Feres* from cases in which negligence is alleged on the part of a government employee who is not a member of the military. Finding the effect of a suit on military discipline to be the *Feres* doctrine's primary justification, the Court ruled that the doctrine did not bar the suit because there was no indication that the conduct or decisions of military personnel would be subjected to scrutiny if the case proceeded to trial. The United States Supreme Court reversed, holding that the *Feres* doctrine bars an FTCA suit on behalf of a service person killed incident to service even if the alleged negligence was by civilian employees of the federal government.

poses of the *Feres* doctrine.[3] The factors to be considered include (1) the duty status of the service member; (2) the place where the injury occurred; and (3) the activity in which the serviceman was engaged at the time of the injury. The Eleventh Circuit Court of Appeals recently stated that the trial court must first evaluate the relative weight of these factors and then, based on the totality of the circumstances, determine whether the activity was incident to service. *See Pierce v. United States*, 813 F.2d 349 (11th Cir.1987). This Court must bear in mind the Supreme Court's warning that "[t]he *Feres* doctrine cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in *Feres* and subsequent cases." *United States v. Shearer*, 473 U.S. 52, 57, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985).

The following facts are not in dispute. On April 13, 1959, President Eisenhower approved an agreement among the Departments of Defense, the Army, the Navy, the Air Force and the National Aeronautics and Space Administration [NASA] concerning the detailing of military personnel to NASA.[4] *See* App. I. This agreement has remained essentially unchanged since its approval. In 1976, the Department of Defense and NASA executed a Memorandum of Understanding [MOU] among the Department of Defense, the Army, the Navy, the Air Force and NASA, which updated the 1959 agreement and provided for the detail of military personnel to NASA as space shuttle astronauts. *See* App. II. By its terms, the MOU is designed, in part, to "[p]rovide effective support for the national program of developing the Space Transportation System, using specific skills and knowledge possessed by military members of the Army, Navy, AF and Marine Corps." *Id.* at § I(a).

Commander Smith, a commissioned officer of the United States Navy, was one of nineteen persons whose selection as Astro-naut Candidates was announced on May 29, 1980. Thirteen of these Astronaut Candidates, including Commander Smith, were military personnel detailed to NASA by the armed services. In October of 1981, Commander Smith was certified as a member of the United States Astronaut Corps. He was subsequently designated to serve as the pilot of the Challenger on its ill-fated flight.

At the time the accident giving rise to this action occurred, Commander Smith was on active military duty. His detail to NASA did not affect his military status, rank and privileges. *See* App. I and II at § IV(a). He remained subject to the Uniform Code of Military Justice and to the policies and directives of the United States Navy with regard to discipline, leave, flying requirements, and other policies and directives which did not affect his NASA responsibilities. *See* App. I at § IV(a) and App. II at § IV(e). The promotion policies of the United States Navy also continued to apply to Commander Smith. *See* App. I at § IV(a) and App. II at § IV(g). As a result of his death, his dependents are receiving death benefits under the Veterans' Benefits Act.

Plaintiff asserts that the "incident to military service" test is not met in this case because, at the time of his death, Commander Smith was subject to the orders and direction of NASA, a civilian agency, and was not subject to military control; his activities had nothing to do with the military and he had no military duties; and his death did not occur on a military reservation.

The Court will consider each of the three *Parker* factors seriatim.

### Duty Status

Plaintiff maintains that the "duty status" factor is not met in this case because Commander Smith was "not on regular mil-

---

**3.** The same three-part test has also been adopted by other Circuit Courts of Appeal. *See, e.g., Brown v. United States*, 739 F.2d 362 (8th Cir. 1984), *cert. denied,* 473 U.S. 904, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985).

**4.** The participation of military personnel in NASA space flight programs had its genesis in the National Aeronautics and Space Act of 1958, 42 U.S.C. § 2451, *et seq.*

itary assignment and in fact had no military duties whatever at the time of his death." Plaintiff's Memorandum in Opposition to Defendant United States of America's Motion to Dismiss, Doc. No. 32 at 5. This Court disagrees.

In *Stanley v. Central Intelligence Agency*, 639 F.2d 1146 (5th Cir.1981), the plaintiff serviceman contended that his participation in a chemical warfare testing program should not be considered "activity incident to service" because he had been given a release from his regular duties in order to participate in the program. The Fifth Circuit Court of Appeals found the plaintiff's argument to be without merit, citing with approval several cases wherein the courts had found that a plaintiff had suffered injury while performing an activity incident to service even though the plaintiff had been released from his routine service duties or was off-duty. The *Stanley* Court concluded:

> In contrast [to the plaintiff in *Parker v. United States* ], Stanley was not on a pass and was not tending to purely personal business at the time this alleged injury arose. At the time Stanley was given LSD, he was a Master Sergeant in the Army who had volunteered to participate in an experimental program in lieu of his regular duties. The experiment was conducted on an Army base by and for the benefit of the Army. Thus, the relationship between Stanley and the allegedly negligent individuals stemmed from their official military relationship. Stanley had been informed that he was free to leave the testing program at any time; however, this freedom appears to have been restricted to his returning to his original post at Fort Knox. He did return to his original duties there after he was released from Edgewood and remained in the service for eleven years. At least, therefore, he was subject to ultimate military control throughout the duration of his participation in the program. Stanley was receiving military pay and was promised a letter of commendation for his participation in the program. Clearly his participation in the program was activity incident to his military service despite the fact that he had been given a release from his regular duties.

639 F.2d at 1152 (citations omitted).[5]

As noted above, Commander Smith was a career officer on active duty with the United States Navy at the time of the Challenger disaster. He had volunteered to participate in the NASA space shuttle program and competed against others for a position as an astronaut. While detailed to NASA, Commander Smith was not subject to direct military orders and was not required to perform his regular Navy duties; his NASA participation was in lieu of his regular duties. He was, however, subject to military policies and directives to the extent that they did not affect NASA responsibilities, and he retained his military rank and

5. Although the Court of Appeals found that the trial court correctly applied *Feres* and held the United States immune to all of Stanley's claims under the FTCA, the Court reversed the trial court's granting of summary judgment and remanded, finding that the trial court should have dismissed the case for lack of subject matter jurisdiction. 639 F.2d at 1148. Stanley filed an amended complaint. The district court dismissed Stanley's FTCA action, 549 F.Supp. 327 (D.C.Fla.1982), and also dismissed Stanley's *Bivens* action, 552 F.Supp. 619 (D.C.Fla.1982). Stanley then filed a second amended complaint. The district court denied Stanley's motion to amend his *Bivens* complaint and certified its order for interlocutory appeal. The Eleventh Circuit Court of Appeals affirmed and, in addition, ordered reinstatement of Stanley's FTCA action on the ground that controlling precedent interpreting the *Feres* doctrine did not automatically bar Stanley's FTCA claims. 786 F.2d 1490 (11th Cir.1986). On appeal, the United States Supreme Court held, in pertinent part, that the issue of whether Stanley's participation in drug testing was incident to his service had been decided adversely to Stanley and there was "no warrant for reexamining that ruling...." *United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 3061, 97 L.Ed.2d 550 (1987). On remand, the Court of Appeals acknowledged the Supreme Court's holding that it did not have jurisdiction of Stanley's FTCA claims when it entered its decision reinstating the FTCA claims, and, therefore, stated that the "order has no effect on the district court's dismissal of Stanley's FTCA claims." 828 F.2d 1498, 1499 (11th Cir.1987). In any event, recent United States Supreme Court precedent calls into doubt the reasoning expressed by the Court of Appeals in its second decision in *Stanley*. *See* note 8, *infra*.

privileges. The Court finds that Commander Smith remained "subject to ultimate military control throughout the duration of the [space shuttle] program."

### Place of Death or Injury

■ Neither the alleged negligence giving rise to the shuttle disaster nor Commander Smith's death occurred on a military reservation. The fact that a death or an injury, or the allegedly negligent act which resulted in the death or injury,[6] occurred on a military base is strong evidence that a plaintiff was engaged in activity incident to service. *Stanley*, 639 F.2d at 1151. The fact that a death or injury occurred while the service person was off the military base, however, does not preclude application of the *Feres* doctrine to bar recovery under the FTCA. *See, e.g., United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985); *Satterfield v. United States*, 788 F.2d 395 (6th Cir.1986); *Stansberry v. Middendorf*, 567 F.2d 617 (4th Cir.1978).

### Activity at the Time of Death or Injury

The last prong of this Circuit's three-part test for determining whether an activity was incident to service requires the Court to consider the activity in which the serviceman was engaged at the time of the occurrence giving rise to the action. As noted above, Plaintiff contends that her husband's position as pilot aboard the space shuttle Challenger was not an activity incident to his military service because Commander Smith was not performing a military mission and was not under the compulsion of military orders. This Court rejects the argument that no proximate relationship existed between Plaintiff's employment as the Challenger pilot and his

status as a serviceman and finds instead that the activity in which Plaintiff was engaged at the time of his death—piloting the space shuttle Challenger—arose by virtue of his status as a member of the armed services.

It is true that civilians are eligible to become space shuttle crew members [7] and that civilians were, in fact, among the crew members killed aboard the Challenger. For purposes of this inquiry, however, the salient fact is that Commander Smith was aboard the space shuttle as a result of his participation in a program whereby military personnel are detailed to NASA to perform appropriate services.

### Application of the Feres Doctrine Rationales

The Court finds from the totality of the circumstances that Commander Smith's death occurred during activity incident to his military service. Accordingly, the Court must now consider whether the rationales underlying the *Feres* doctrine preclude Plaintiff's suit against the United States of America.

Because Commander Smith was killed while performing activities incident to his military service, the Court finds that the first rationale—the federal relationship—is implicated here. *See Johnson*, 107 S.Ct. at 2068 (this rationale "is implicated to the greatest degree when a service member is performing activities incident to his service"). The second rationale underlying the *Feres* doctrine is also implicated in this case because, as a result of his death, Commander Smith's dependents are receiving and will continue to receive Veterans' benefits.

Whether the third, and possibly most

---

**6.** This Court questions the relevance of the "military base" test to the situs of the death or injury in cases where the death or injury occurs in flight, especially when the allegedly negligent act which gave rise to the death or injury occurred elsewhere. *See Bozeman v. United States*, 780 F.2d 198 (2d Cir.1985) (holding that, in applying the *Feres* doctrine, the district court

properly looked to the location of the alleged conduct giving rise to the tort liability).

**7.** *See, e.g.,* App. II at § II(b) ("It is understood that NASA is now desirous of initiating the process by selecting approximately 30 shuttle crew members, a substantial number of whom

compelling rationale,[8] is implicated in this case is a harder question. This rationale involves

> [t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty....

*Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977) (quoting *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954)). The Supreme Court recently elaborated:

> Even if military negligence is not specifically alleged in a tort action, a suit based upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission. Moreover, military discipline involves not only obedience to orders, but more generally duty and loyalty to one's service and to one's country. Suits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word.

*Johnson*, 107 S.Ct. at 2069.[9]

Despite *Johnson*'s teaching that the third *Feres* rationale encompasses "military discipline in the broadest sense of the word," this Court is not convinced that military discipline concerns are implicated under the peculiar facts of this case. The serviceman in *Johnson* was killed while "acting pursuant to standard operating procedures of the Coast Guard" during a Coast Guard mission. *Id.* Thus, "the po-

tential that [the] suit could implicate military discipline [was] substantial." *Id.* Commander Smith, on the other hand, was killed while on a mission for NASA, a civilian agency, during which time he was under the direct supervision of NASA, not military, personnel.

Defendant United States asserts that the "maintenance of this suit could lead directly into questions concerning the military's monitoring, participation and management —or lack thereof—of a civilian program from which the military derives direct benefits." The Court finds that no real likelihood of such inquiry exists. It does not appear from this record that the alleged acts of negligence in this case would raise "the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands," *Stanley*, 107 S.Ct. at 3063; that it would require military officers to testify as to each other's decisions and actions, *see Shearer*, 473 U.S. at 58, 105 S.Ct. at 3043; that Plaintiff's claims would involve "second-guessing" military decisions, *id.* at 57, 105 S.Ct. at 3043; that the claims would implicate the "management" of the military, *Shearer*, 473 U.S. at 58, 105 S.Ct. at 3043; or that the claims would call into question "basic choices about the discipline, supervision, and control of a serviceman." *Id.*

This Court has found, however, that the first two rationales underlying the doctrine militate in favor of the conclusion that Plaintiff's claims against Defendant United States of America are barred. In view of these circumstances, and in light of the United States Supreme Court's recent endorsement of the first two *Feres* rationales in *United States v. Johnson, see* note 8, *supra*, this Court is compelled to find that

---

*might* be selected from the [military]") (emphasis added).

**8.** In *United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), the United States Supreme Court indicated that the military discipline rationale was determinative and that the other rationales underlying *Feres* were "no longer controlling," *id.* at 58 n. 4, 105 S.Ct. at 3043 n. 4. In *United States v. Johnson*, 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987), how-

ever, the Court cited with approval all three of the *Feres* rationales, thus "breath[ing] new life into the first two *Feres* rationales." *Atkinson v. United States*, 825 F.2d 202, 205–06 (9th Cir. 1987). Whether the military discipline rationale should be afforded any greater weight than the other rationales is presently unclear.

**9.** *See* note 2, *supra*.

it lacks subject matter jurisdiction over the Plaintiff's FTCA claims against Defendant United States of America.

■ In the remaining Count, Plaintiff seeks equitable relief permanently enjoining Defendants United States of America and Morton Thiokol, Inc., from further performance under the existing contract for supply of solid rocket boosters to NASA and debarment of Morton Thiokol from further work in the shuttle program. The Court finds that Plaintiff has failed to allege a sufficient basis for her standing to bring this action for injunctive relief. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Accordingly, this claim must be dismissed.

For the reasons expressed, the Plaintiff's claims brought pursuant to the Federal Tort Claims Act (Counts One, Two, Three, Four and Five) are hereby DISMISSED as to Defendant United States of America pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, for lack of subject matter jurisdiction. Count Six is hereby DISMISSED as to Defendants United States of America and Morton Thiokol.

DONE AND ORDERED.

### COURT'S APPENDIX I

Agreement Between
the Departments of Defense, Army, Navy and Air Force
and
The National Aeronautics and Space Administration
Concerning the Detailing of Military Personnel
for Service with NASA

This agreement shall govern the detailing of members of the Army, the Navy, the Air Force and the Marine Corps for service with the National Aeronautics and Space Administration (NASA) as provided for in Section 203(b)(12) of the National Aeronautics and Space Act of 1958 (P.L. 85–568).

I.  General

NASA, the Department of Defense, and the Military Departments, through their respective Members on the Civilian-Military Liaison Committee (CMLC)[1] will arrange by mutual agreement for the detailing of military personnel to perform appropriate services for NASA in furtherance of the functions assigned to NASA by the National Aeronautics and Space Act of 1958. As requirements arise within NASA for services of military personnel, NASA and the Department of Defense through such CMLC Members will agree on the nature of duties to be performed by such personnel, the organizational positions in NASA to which each of the military personnel will be assigned, and the names of military personnel to be detailed to perform such duties. Such agreements will in each case be confirmed by letter.

II.  Requests and Designations

(a)  NASA will advise the CMLC Member concerned as soon as it foresees a requirement for the services of a member of the military services. Such request will be confirmed in writing, with copies to all CMLC Members, describing the qualifications and the duties to be performed by each person to be detailed to NASA and the date when NASA would like to have the person available for duty.

ATTACHMENT A TO NMI 1052.11A

(b)  The CMLC Member concerned will furnish to NASA as promptly as possible, recommendations of individuals to be detailed, including names, ranks, and summaries of the qualifications of persons recommended.

III.  Acceptance and Detail *

(a)  NASA will advise the CMLC Member concerned as promptly as possible when a person recommended for detailing has been accepted. Personnel accepted by NASA

---

[1] As used in this Agreement, the term "Members of the Civilian-Military Liaison Committee" means "offices designated by a Military Department for this purpose" or "a Military Department" itself. (This clarification is effective February 13, 1962.)

* Amended, effective September 14, 1963, see Attachment B.

will be detailed to duty with NASA by the Military Department concerned as closely as possible to the date agreed upon between NASA and the CMLC Member involved.

(b) The Military Departments will assign members detailed to NASA to appropriate military units for the purposes of providing rations, quarters, medical treatment, and other administrative services and will inform NASA of such assignment. Those military units will provide NASA with appropriate information required for personnel administration, including the security clearances of the personnel detailed.

(c) (1) The normal tour of duty with NASA for military personnel on active duty will be three years. In the case of ROTC graduates the tour may be shorter. NASA will send a timely request to the Military Department concerned, through the Department's Member on the CMLC, for any desired extension. Each request for extension of a tour of duty with the NASA will be for no more than one year.

(2) Military personnel detailed to the Agency may be recalled prior to the end of the normal tour of duty upon the request of the Administrator, NASA.

(3) The Military Department concerned may recall any person detailed to NASA if the Secretary of the Department concerned determines that recall of the individual concerned is required, or if the active duty status of that person is to be terminated. The Military Department concerned will give NASA reasonable advance notice of plans to recall a detailed person.

IV. Status, Direction and Control

(a) Service in NASA under this Agreement will in no way adversely affect the status, rank, office, or grade which commissioned officers or enlisted men may occupy or hold or any emolument, perquisite, right, privilege or benefit (including promotion in military rank) incident to, or arising out of any such status, rank, office, or grade. Personnel detailed to NASA will remain subject to the Uniform Code of Military Justice and to policies and directives of the Military Department concerned with regard to military discipline, leave, and flying requirements.

(b) Except as noted in (a) above, persons detailed or appointed to NASA will not be subject to direction or control by the Department from which detailed with respect to their duties and responsibilities with NASA. Personnel detailed to NASA will be governed by all appropriate regulations and directives of NASA.

(c) The Military Departments will not assign duties to the personnel detailed to NASA in addition to their duties with NASA. However, it is agreed that detailed officer personnel may provide liaison between NASA and their respective Military Departments in technical areas of mutual interest. Also, under extraordinary circumstances a Military Department, through its CMLC Member, may request NASA to assign military personnel on detail to some special duty.

(d) Effectiveness reports for military personnel detailed to NASA will be prepared in accordance with the regulations of the officer's service by NASA personnel responsible for supervision of the officer involved, in consultation with an officer designated for this task by the Military Department involved.

(e) NASA will advise the CMLC Member of the Military Department concerned when significant changes are made in the position or duties of a person detailed to NASA. Changes will be made in duty stations only with concurrence of the Military Department concerned.

V. Pay and Reimbursement

(a) The Military Departments will pay to personnel whom they detail to NASA all pay and allowances as provided by the Career Compensation Act of 1949, as amended, except as may be otherwise provided in (c), (d), and (e) below.

(b) NASA will reimburse the Military Departments for all payments made in accordance with the preceding paragraph. This obligation of NASA will begin and terminate on the dates of detachment for Navy personnel and on the effective dates of change of station for Army and Air Force personnel. The Military Departments will send requests for reimbursement to the Agency on a quarterly basis.

(c) The Military Departments will bear costs incident to the initial detail of their personnel to NASA. NASA will bear the costs incident to the termination of details.

(d) NASA will pay all travel costs incident to the performance of duties for NASA by personnel detailed to NASA, including costs associated with changes in duty stations.

(e) Reimbursement of travel costs to detailed personnel will be in accordance with Joint Travel Regulations.

## VI.  Special Agreements

Matters that are of peculiar concern to one of the Military Departments of detailing of personnel for projects of a special nature may require special agreements between the Military Department concerned and NASA. Any such special agreements shall be put in the form of Annexes to this Agreement signed by appropriate representatives of NASA and the Military Department concerned. If any special agreement is proposed under this provision, the Military Department concerned will keep the other Military Departments and the Secretary of Defense fully informed of the development of the proposed special agreement.

## VII.  Previous Agreements

This agreement supersedes all agreements regarding the detail of personnel between the Military Departments and the NACA. Personnel detailed to NASA under those agreements shall continue to serve under the terms of this agreement, as though initially detailed hereunder.

For the National Aeronautics and Space Administration:

Signed T. Keith Glennan
date:    24 February 1959

For the Department of Defense:

Signed Donald A. Quarles
date:    3 Apr '59

For the Department of the Army:

Signed Wilber M. Brucker
date:    12 March 1959

For the Department of the Navy:

Signed Thomas S. Gates
date:    March 12, 1959

APPROVED: (S) Dwight Eisenhower

April 13, 1959
The President

For the Department of the Air Force:

Signed James H. Douglas

date:    March 24

## ATTACHMENT B TO NMI 1052.11A
Amendment No. 1 to Agreement
Between the Departments of Defense, Army, Navy and Air Force
and
The National Aeronautics and Space Administration
Concerning the Detailing of Military Personnel
for Service with NASA

### Acceptance and Detail

Section III of the Agreement shall be amended by adding the following subparagraphs:

(d) At intervals of approximately one year following detailing to NASA, each military assignee of the rank of Major/Lieutenant Commander or above fulfilling a technical assignment will be ordered by the Military Department concerned to one week of temporary duty with that Department, preferably at his Service Headquarters but alternatively at an appropriate field command or establishment designated by the parent Service, in order that he may become up-dated in the latest military requirements and weapon system developments within his Service, and may convey to his Service the latest technical information available within NASA and related to such requirements and developments.

(e) The agreed arrangements concerning pay and allowances will not be affected by this temporary duty. Basic travel costs incident to these periods of temporary duty will be

borne by NASA. The costs of any additional travel ordered by the Service concerned during the period of temporary duty will be borne by that Service.

For the National Aeronautics
and Space Administration:

Date _____ JUL 1 · 1963 _____

For the Department of
Defense:

Date _____ 9/14 _____

COURT'S APPENDIX II

MEMORANDUM OF UNDERSTANDING (MOU)
BETWEEN
THE DEPARTMENT OF DEFENSE, THE ARMY, THE NAVY
AND THE AIR FORCE
AND
THE NATIONAL AERONAUTICS AND SPACE ADMINISTRATION
CONCERNING THE DETAILING OF MILITARY PERSONNEL
FOR SERVICE AS SHUTTLE CREW MEMBERS

This agreement shall govern participation by military personnel of the Army, Navy, Air Force and Marine Corps in carrying out the functions of the National Aeronautics and Space Administration (NASA) as shuttle crew members, as provided by Section 203(c)(12) of the National Aeronautics and Space Act of 1958. To the extent that the Agreement Between the Departments of Defense, Army, Navy, and Air Force and The National Aeronautics and Space Administration concerning the Detailing of Military Personnel for Service with NASA, effective 13 April 1959 *, pertains to the tour of duty of military personnel detailed to NASA as astronauts, that agreement is modified by this agreement.

I. GENERAL

This MOU is designed to:

(a) Provide effective support for the national program of developing the Space Transportation System, using specific skills and knowledge possessed by military members of the Army, Navy, AF and Marine Corps.

(b) Insure that NASA and the DOD, through their designated representatives, will agree on the duty stations and the nature of duty to be performed by each individual.

II. REQUESTS AND DESIGNATIONS

(a) NASA will sent requests to the DOD at least twelve months in advance to fill positions agreed upon under paragraph I above which are or will become vacant. Each Service will be notified of said request by DOD, and each Service will prepare a list of candidates to fill said positions on a "best qualified" basis, and submit the list to NASA JSC, Houston, Texas. NASA will select potential shuttle crew members from these lists. Each Service will be particularly aware of NASA's desire to encourage participation by women and minority groups as crew members and will ensure that procedures are designed to maximize the opportunities for them to apply.

(b) It is understood that NASA is now desirous of initiating the process by selecting approximately 30 shuttle crew members, a substantial number of whom might be selected from the DOD. As outlined in (a) above, each Service will provide to NASA a list of qualified candidates no later than 1 July 1977, meeting criteria to be provided between the parties. Each candidate's name should be accompanied by an appropriate personnel folder, containing such information as required by NASA. For this selection cycle, both shuttle pilots and shuttle mission specialists are required.

III. ACCEPTANCE AND DETAIL

(a) NASA will advise the Services concerned as soon as possible, listing those candidates selected.

* See NMI 1052.11A

(b)    It is understood that the candidates selected in the cycle beginning 1 July 1977 are accepted by NASA only as <u>potential</u> shuttle crew members, subject to the successful completion of a training and indoctrination period lasting approximately two years. NASA will promptly inform the appropriate Service of any candidates who are not selected as shuttle crew members. Upon said notification, these individuals will be reassigned to their respective Services.

(c)    Those potential crew members who successfully complete their training and indoctrination period will be certified by NASA as shuttle crew members, and their respective Services will be so informed. Upon such notification, a five-year tour of duty will commence. Upon completion of said tour, reassignment of these personnel will be made by their respective Service. A one-year tour extension is possible if both NASA and the respective Services agree. The five-year tour can also be shortened if both NASA and the respective Service desire.

## IV. STATUS, DIRECTION AND CONTROL

(a)    The detail of military members to NASA shall in no way affect the status, office, rank or grade which they may occupy or hold or any emolument, perquisite, right, privilege, or benefit incident to or arising out of any such status, office, rank, or grade.

(b)    NASA allocations of manpower spaces will be made by individual Service addenda to this MOU and are subject to annual validation by the Department of Defense.

(c)    A military member detailed to NASA shall not be subject to direction by or control by his Service or any officer thereof directly or indirectly, with respect to NASA responsibilities exercised in the position to which detailed.

(d)    Military personnel detailed in accordance with this agreement will be subject to all appropriate regulations and directives of NASA. While detailed to NASA pursuant to this MOU, military members will be subject to NASA regulations, concerning standards of conduct of NASA employees as well as those of the Department of Defense.

(e)    Military personnel detailed to NASA will remain subject to the Uniform Code of Military Justice and to the policies and directives of the Military Department concerned with regard to military discipline, leave, flying requirements, and other policies and directives which do not affect responsibilities exercised in NASA. Personnel will be granted sufficient time to satisfy military requirements, including, but not restricted to, annual physicals, accomplishment of practical factors for advancement, annual verification of service records, and certain pay record verifications.

(f)    NASA will prepare each military member's fitness, efficiency or effectiveness report in accordance with the regulations of the member's service.

(g)    Promotion policies of the individual Services will continue to apply to shuttle crew members.

(h)    The position, duties, or duty station of a person detailed to NASA may be changed only upon mutual agreement of the Service concerned and NASA.

(i)    If need arises during the detail for access to a higher level of classified information, the Military Department concerned shall process the necessary clearance. NASA shall process any required special security clearance or authorization which becomes necessary during the detail, and shall conduct related security debriefings as required.

## V. PAY AND REIMBURSEMENT

(a)    The Services will pay personnel whom they detail to NASA all normal active duty pay, including hazardous duty pay where applicable, and allowances.

(b)    NASA will reimburse the Services for all payments made in accordance with the preceding paragraph and Sections 23003.F.2 and 252, DOD Accounting Guidance Handbook. In addition, interim rates are now in effect governing reimbursement procedures for PCS travel costs. Pending inclusion of these rates in Section 252 of the Handbook, NASA will reimburse the Services based on the interim rates now in effect.

(c)    NASA will pay all travel costs incident to the performance of duties for NASA by personnel detailed to NASA, including costs associated with changes in duty stations.

(d)    Reimbursement of travel costs of personnel on detail will be in accordance with Joint Travel Regulations in effect at that time.

(e) The Services will send requests for reimbursement on a quarterly basis to the administration element within NASA.

Secretary of Defense
DATE: 23 November 19[6]

Acting Secretary of the Army
DATE: 14 SEP 1976

Acting Secretary of the Navy
DATE: 

Acting Secretary of the Air Force
DATE: Aug 16 1976

Administrator, NASA
DATE: Dec 17, 1976