EBEL, Circuit Judge,
concurring.
I agree with the majority’s conclusion that the Feres doctrine, which immunizes the United States from liability for service-related injuries to military servicemem-bers, bars civilian I.O.’s medical malpractice claim against the Government. I therefore concur in affirming the district court’s order granting the Government’s motion to dismiss. Nonetheless, I write separately because I disagree with the majority’s conceptual approach for determining whether Feres bars a civilian’s claim for in útero injuries that arise out the military’s provision of medical care to a servicemember mother.
The majority identifies two approaches for determining whether Feres applies in the context of this case — i.e., an injury-focused approach and a treatment-focused approach — and ultimately adopts the injury-focused approach. See Maj. Op. at 826, *834 828-32. I do not find either of these approaches persuasive. Accordingly, I propose a new, third approach’ that tethers the military’s Feres-immunity to the military’s conduct toward its servicemembers.
Thus, instead of focusing on whether the servicemember mother was injured by the medical treatment that harmed her fetus, as the injury-focused approach does, or on whether the servicemember mother was the intended target of the medical treatment that harmed her fetus, as the treatment-focused approach does, I would simply consider whether the civilian child’s in útero injuries flowed directly from the military’s immunized conduct toward its pregnant servicemember. If they do, then Feres bars the claim. This approach— which can be described as a conduct-focused approach — is not only most consistent with the policy behind Feres and principles of immunity more generally, but also easier to apply and less prone to adverse unintended consequences.
Applying my conduct-focused approach here, I.O.’s claim is Feres-barred because her in útero injuries flowed directly from the military’s provision of obstetric care to her active-duty servicemember mother. In other words, because I.O.’s injuries were a direct consequence of the military’s protected conduct toward its pregnant ser-vicemember, the military is immune from liability. Because I believe this is the most straight forward application of Feres to this factual scenario, I disagree with the majority’s adoption of an injury-focused approach.
I. Advantages of a conduct-focused approach
A conduct-focused approach for determining whether a civilian’s claim for in útero injuries is Feres-barred offers two major advantages over the majority’s focus on the injury to the servicemember mother. First, by focusing the immunity inquiry on the military’s conduct toward its pregnant servicemember, a conduct-focused approach is most consistent with the fundamental purpose of Feres — i.e., to protect the “peculiar and special” relationship between the military and its servicemem-bers. Rather than focusing on this relationship and the conduct that is driven by it, the majority’s focus ¿n whether the servicemember mother wal injured undercuts the purpose of Feres immunity by subjecting the military to possible liability for in útero injuries that flow from the very conduct Feres is designed to shield from judicial scrutiny. ,
Second, by tethering: the military’s Feres-immunity to its ponduct — rather than to the often unpredictable consequences of such conduct — a conduct-focused approach comports with this Court’s front-loaded immunity inquiry in other contexts. The majority’s approach conflicts with our standard front-loaded immunity inquiry by conditioning the military’s Feres immunity with respect to a civilian child’s claim for in útero injuries on a post-hoc determination whether the service-member mother was injured at the same time her fetus was injured.'
a. A conduct-focused approach is most consistent with the fundamental purpose of Feres.
When the Supreme Court initially created the Feres doctrine in 1950, it offered several justifications for its decision to immunize the military from tort liability for incident-to-serviee injuries sustained by servicemembers.[1] See Feres v. United *835 States, 340 U.S. 135, 140-45, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Over time, as courts distilled these justifications, three overriding rationales for the Feres doctrine emerged: (1) the distinctly federal nature of the military’s relationship to its service-members; (2) the availability of alternative compensation systems for injured service-members; and (3) the need to preserve the military disciplinary structure by preventing judicial intrusion upon, and second-guessing of, military decisions. See Ricks v. Nickels, 295 F.3d 1124, 1128-30 (10th Cir.2002).
Although the viability of the first two rationales has diminished in recent years, see United States v. Shearer, 473 U.S. 52, 58 n. 4, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) (suggesting that the first and second rationale are “no longer controlling”); United States v. Stanley, 483 U.S. 669, 683, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (characterizing the second rationale as “irrelevant”), the Supreme Court has consistently reaffirmed the fundamental importance of the third rationale, see Ricks, 295 F.3d at 1130 (explaining that the importance of the third rationale has increased as the importance of the first two rationales has decreased).[2] As the Supreme Court explained in Chappell v. Wallace,
the Feres Court was acutely aware that it was resolving the question of whether soldiers could maintain tort suits against the government for injuries arising out of their military service. The Court focused on the unique relationship between the government and military personnel — noting that no such liability existed before the Federal Tort Claims Act — and held that Congress did not intend to create such liability.... As the Court has since recognized, “[i]n the last analysis, Feres seems best explained by the ‘peculiar and special relationship of the soldier to his superiors, [and] the effects on the maintenance of such suits on discipline
462 U.S. 296, 299, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). (emphasis added) (quoting United States v. Muniz, 374 U.S. 150, 162, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)).
Because Supreme Court precedent clearly establishes that the military-ser-vicemember relationship is at the heart of the Feres doctrine, I disagree with the majority’s assertion that “the service member’s injury — and by extension, the derivative nature of a third-party injury — is the touchstone of all Feres claims.” Maj. Op. at 829. By conditioning Feres immunity on the existence of an injury to a service-member, the majority makes damages the central inquiry in a Feres-immunity defense. I believe, to the contrary, that *836 Feres immunity ultimately turns on the nature of the military’s allegedly wrongful conduct rather than the injurious consequences of such conduct. See infra p. 838-39. Although an injury to the plaintiff is certainly a necessary element in a successful damages claim, it seems odd to make an injury to another person essential to resolving the jurisdictional question of Feres immunity.
The Supreme Court’s continued reliance on the “peculiar and special” military-ser-vicemember relationship as the primary justification for Feres makes sense given the unique structure and operational realities of the military establishment. Chappell, 462 U.S. at 300, 103 S.Ct. 2362. The military is, in all respects, a “specialized community.” Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). This community simply cannot accomplish its mission “without strict discipline and regulation that would be unacceptable in a civilian setting.” Chappell, 462 U.S. at 300, 103 S.Ct. 2362; see also Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (explaining that to succeed “the military must foster instinctive obedience, unity, commitment, and esprit de corps”). Such are the necessities of military service that the rights of servicemembers must “be conditioned to meet certain overriding demands of discipline and duty,” Chappell, 462 U.S. at 300, 103 S.Ct. 2362 (quoting Burns v. Wilson, 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (plurality opinion)), and the authority of civilian courts must be carefully circumscribed to prevent inappropriate judicial intrusion into military matters, see Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (explaining that the “complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments,” the responsibility for which “is appropriately vested in branches of the government which are periodically subject to electoral accountability”); see also Orloff, 345 U.S. at 94, 73 S.Ct. 534 (“Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.”).
As the Supreme Court explained in United States v. Johnson,
a suit upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission. Moreover, military discipline involves not only obedience to orders, but more generally duty and loyalty to one’s service and to one’s country. Suits brought by service members against the Government for service-related injuries could undermine the commitment essential to effective service and thus have the potential to disrupt military discipline in the broadest sense of the word.
481 U.S. 681, 691, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987) (footnote omitted).
Although the danger of disrupting the military-servicemember relationship is strongest when a servicemember brings a damages action directly against the military, in Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), the Supreme Court recognized that the same danger lurks when a third party brings an indemnity action against the military seeking to recover damages paid by the third party to a servicemember. In Stencel, a servicemem-ber sustained permanent, service-related injuries when the ejection system in his aircraft malfunctioned during a midair emergency. 431 U.S. at 667, 97 S.Ct. 2054. After paying the servicemember for his *837 injuries, the private company that manufactured the defective ejection system filed a third-party indemnity action against the United States, arguing that the United States provided faulty specifications and components for the defective system and was therefore primarily responsible for the servicemember’s injuries. Id. at 668, 670, 97 S.Ct. 2054. Relying on Feres, the United States argued that it was immune from liability because the company was essentially standing in the shoes of the service-member, whose direct damages action against the United States was itself Feres-barred. Id. at 669, 97 S.Ct. 2054.
The Supreme Court agreed, concluding that the company’s third-party indemnity action was “unavailable for essentially the same reasons” that the direct action by the servicemember was unavailable. Id. at 673, 97 S.Ct. 2054. In reaching this conclusion, the Court emphasized that the third Feres rationale weighed against permitting the company’s recovery. Id. As the Court explained, where a case “concerns an injury sustained by a soldier while on duty, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party.” Id.
As the Court’s analysis in Stencel suggests, certain non-servicemember actions against the military are sufficiently related to the military’s immunized conduct toward its servicemembers that they pose the same danger to the military-service-member relationship as actions brought directly by a servicemember. Although the Court has never explicitly extended its Stencel rationale beyond the indemnity context,[3] a civilian’s claim for in útero injuries calls for such an extension because it poses the same threat to the military-ser-vicemember relationship as a servicemem-ber’s own claim for pregnancy-related injuries. Just like the company’s indemnity action in Stencel, which would not have existed but for the military’s provision of aircraft equipment to the injured service-member, a civilian child’s damages action for in útero injuries would not exist but for the military’s provision of obstetric care to the servicemember mother.
*838 Consistent with Stencel, the conduct-focused approach I suggest for determining whether a civilian child’s claim for in útero injuries is Feres-barred protects the military-servicemember relationship by focusing on the military’s conduct. Since the military is immune from liability when its provision of service-related medical care causes injuries to a pregnant servicemember, see Madsen v. U.S. ex rel. U.S. Army, Corps of Eng’rs, 841 F.2d 1011, 1012-13 (10th Cir.1987) (applying the Feres doctrine to bar medical malpractice claim brought by active duty servieemember), a conduct-focused approach ensures that the military is also immune from liability when that exact same conduct causes in útero injuries to the servicemember’s unborn child, cf. Harten v. Coons, 502 F.2d 1363, 1364-65 (10th Cir.1974) (implicitly concluding that a civilian wife’s claim against the military for wrongful pregnancy as a result of the military’s negligent vasectomy operation on her service member husband was Feres-barred for the same reasons that her husband’s claim was barred). In other words, the military’s immunity is the same regardless of which potential claimant ultimately challenges the military’s conduct.
In contrast to the military’s predictable and knowable immunity under a conduct-focused approach, the majority’s approach, which requires injury to a servieemember mother before the military is immune from liability for in útero injuries, breeds inconsistency and uncertainty. For example, the majority would subject the military to potential liability for in útero injuries if subsequent litigation revealed that the ser-vicemember mother was not “truly” injured at the time her fetus was injured. See Maj. Op. at 832. Yet, if subsequent litigation revealed that the servieemember mother did suffer injuries of her own, however slight, then the military would be immune from liability for the in útero injuries suffered by her fetus. It does not make sense to condition Feres immunity on something so malleable and unpredictable.
Moreover, the majority’s approach would permit some civilian children to challenge through a back door the very conduct that pregnant servicemembers would be barred from challenging through the front door. This threat of liability for in útero injuries will inevitably impact how the military fulfills its medical obligations to its pregnant servicemembers. Consider, for example, the perverse incentives that flow from the majority’s approach when a treatment that is needed to preserve a pregnant servicemember’s health poses a great risk of injury to her fetus. Despite the military’s primary obligation to provide competent medical care to its servieemember, the military may, however unconsciously, alter its course of treatment to give primary attention to the fetus rather than to the mother since the possibility of fetal injuries presents the greatest risk of future liability. Because the majority’s approach will influence the military’s medical decision-making with respect to its ser-vicemembers, even if only inadvertently, it intrudes upon the very relationship that Feres is designed to protect.
b. The conduct-focused approach better aligns with general immunity principles.
The conduct-focused approach not only is most consistent with the fundamental purpose of Feres to protect the military-servieemember relationship but also better aligns with principles of immunity generally. Although Feres is tailored to the military context, at its most basic level, Feres is an immunity doctrine that shields qualifying defendants from liability. Accordingly, when determining how best to apply Feres in a given case, this Court’s approach to immunity determinations in oth *839 er, non-military contexts can offer helpful guidance.
Absolute immunity and qualified immunity are two such contexts. Importantly, when determining whether a particular defendant is entitled to absolute immunity or qualified immunity, this Court’s inquiry focuses on the nature of the defendant’s allegedly wrongful conduct, rather than on the often unknowable consequences of this conduct. For example, in Stein v. Disciplinary Board of Supreme Court of New Mexico, this Court emphasized the prose-cutorial nature of the defendant prosecutors’ allegedly wrongful conduct in determining that they were entitled to absolute immunity. 520 F.3d 1183, 1189, 1193-94 (10th Cir.2008). Similarly, in Thomas v. Kaven, this Court considered the unconstitutional nature of the defendant officers’ allegedly wrongful conduct in determining that they were not entitled to qualified immunity at the Rule 12(b)(6) stage of litigation. 765 F.3d 1183, 1195-98 (10th Cir.2014) (explaining that the defendants were not entitled to qualified immunity because the facts, as alleged in the complaint, were sufficient to demonstrate that their decision to place the plaintiff parents’ child on a temporary medical hold violated the clearly established constitutional right to familial association). In neither context was immunity determined by, or predicated upon, the nature of the resulting injury or the identity of the injured person.
This Court’s analytical approach to absolute immunity and qualified immunity suggests that, as a general principle, immunity determinations should turn on the nature of the defendant’s actual conduct, which logically precedes the injurious consequences of such conduct. Conditioning the immunity determination on a defendant’s conduct (which a defendant can control), rather than a plaintiffs injuries resulting from such conduct (which a defendant cannot necessarily control or even anticipate), makes sense given that the defendant is the party seeking the benefit of immunity. Consistent with this Court’s front-loaded approach to immunity in other contexts, the conduct-focused approach I suggest predicates the military’s Feres immunity upon its service-related conduct toward servicemembers.
The majority’s injury-focused approach, in contrast, conflicts with this Court’s general immunity inquiry by conditioning Feres immunity not on the nature of the military’s conduct, but on a court’s later determination whether that conduct did, or did not, coincidentally result in injuries to a servicemember.[4] Because the military *840 (like any other defendant) cannot directly control all of the consequences of its conduct, it is unclear why the military’s Feres-immunity 'should hinge on something as uncertain as a judge’s post-hoc determination whether the servieemember mother suffered an injury. This back-loaded approach not only runs contrary to general immunity principles but also perversely rewards the military — in the form of Feres immunity — when its conduct harms not just the fetus, but the servieemember mother as well. For example, if the military harms both the mother and the fetus, then it is entitled to Feres immunity; but if it harms only the fetus or deliberately chooses to protect its servieemember at the expense of harming the fetus, then it is not entitled to Feres immunity.
And perhaps most problematic, these unpredictable outcomes and perverse rewards force the military into a wholly untenable litigation position whenever it faces possible liability for a civilian child’s in útero injuries. Because the military’s Feres immunity in this context is based on the fortuity of an injury to the service-member mother, to have any chance of successfully invoking such immunity in a suit brought by a civilian child, the military must argue that it injured its pregnant servieemember. But, because it is possible that a court will ultimately determine that the servieemember mother was not injured, thereby foreclosing the availability of Feres immunity, to have any chance of successfully defending against the child’s claim, the military must simultaneously argue that its conduct, although injurious to the mother, was not injurious to her unborn child. There is simply no good reason to require the military to engage in this kind of legal gymnastics in order to avail itself of Feres immunity.
II. Application of the conduct-focused approach
Applying a conduct-focused approach to determine whether I.O.’s claim is Feres-barred, I would simply consider whether her alleged in útero injuries flowed directly from the military’s incident-to-service conduct toward her mother, an active duty servieemember. The military’s provision of obstetric care to I.O.’s servieemember mother is clearly ineident-to-serviee conduct for which the military is immune from liability under Feres. See Madsen, 841 F.2d at 1012-13. Thus, I.O.’s claim is Feres-barred if her alleged in útero injuries can be said to flow directly from this protected conduct. Because I.O.’s in útero injuries necessarily derived from the military’s immunized conduct toward a ser-vicemember, her claim is Fem-barred.
This conclusion stems from the very nature of the mother-fetus relationship, which is unlike any other. Until the moment of birth, mother and fetus are inexplicably intertwined — they share oxygen, nutrients, and a physical body. By virtue of their inseparability, mother and fetus share a unity of interests. Although medical interventions may, at times, be directed more particularly to either the mother or her fetus, at all times the mother’s interest in safely delivering her child aligns with the fetus’s interest in a healthy birth. Because these ultimate interests are indivisible while the fetus is in útero, it seems likely to me that a mother will inevitably be injured whenever her unborn child sustains in útero injuries.
*841 Thus, I disagree with the majority’s conclusion that fetal injuries can occur even though “the mother is truly not injured at all.” See Maj. Op. at 832. This conclusion not only defies the physical realities of pregnancy, but it also fails to acknowledge the unique mother-fetus bond and the inevitable mental or psychological injury a mother experiences whenever her unborn child is injured.
Given the sui generis nature of the mother-fetus relationship, the military’s obligation to provide competent medical care to a pregnant servicemember extends to her unborn child. For the military to care properly for a servicemember during her pregnancy, that care will undeniably include not only attending to the service-member’s health but also attending to .a successful delivery of the fetus from her body. The reality is that the military acts toward both mother and fetus whenever it provides obstetric medical care to either mother or fetus. See Scales v. United States, 685 F.2d 970, 974 (5th Cir.1982) (explaining that the treatment accorded to a pregnant servicemember mother is “inherently inseparable” from the treatment accorded to her fetus). Thus, regardless of whether the military’s obstetric medical care injures the mother or her fetus, or both, Feres immunity attaches because such injuries are a direct result of the mother’s military status.[5]
III. Conclusion
I.O.’s claim is Feres-barred because her in útero injuries necessarily flowed from the military’s ' incident-to-service conduct toward her servicemember mother. Although harsh in its result,[6] this conduct-focused approach has two noteworthy advantages. First, by tethering the military’s Feres-immunity to its service-related conduct toward pregnant servicemembers, the conduct-focused approach is consistent with the fundamental purpose of Feres to protect the “peculiar and special” relationship between the military and its servicemembers. Second, by zeroing in on the nature of the military’s conduct, rather than the consequences of such conduct, the conduct-focused approach aligns with general principles of immunity. As long as Feres remains the law, we are tasked with upholding it. Because I think that a conduct-focused approach is most consistent with this obligation, I respectfully concur.[7]

. Although the Feres doctrine was created in the context of servicemember actions against the United States under the Federal Tort Claims Act ("FTCA”), it has since been ap *835 plied to non-FTCA actions. See Chappell v. Wallace, 462 U.S. 296, 304-05, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (expanding the Feres doctrine to include constitutional claims brought under Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)); Newton v. Lee, 677 F.3d 1017, 1025 (10th Cir.2012) (expanding the Feres doctrine to include constitutional claims brought under 42 U.S.C. § 1983).

. Indeed, the third rationale is the cornerstone of the "incident-to-service test,” which the Supreme Court has identified as the most appropriate test for determining whether a particular claim is Feres-barred. Ricks, 295 F.3d at 1130 (citing Stanley, 483 U.S. at 682-83, 107 S.Ct. 3054); see also Tootle v. USDB Commandant, 390 F.3d 1280, 1282 (10th Cir.2004) (recognizing that the incident-to-service test "has become the primary indicator of the applicability of the Feres doctrine”). A conduct-focused approach to claims for in útero injuries aligns with this test by immunizing the military from liability when in útero injuries flow from the military's incident-to-service conduct toward a servicemember. *840 an unnecessary and superfluous consideration into the Feres inquiry. Moreover, because the military cannot be sure that the mother suffered a factual injury until after litigation has commenced, I do not see how the military would ever know how to evaluate its potential liability at the time it is committing to the actions which later may, or may not, subject it to liability.

. Many of our sister circuits have extended the Supreme Court's analysis in Stencel beyond the indemnity context, creating what is now known as “the genesis test.” See, e.g., Irvin v. United States, 845 F.2d 126, 130 (6th Cir.1988) (noting that "[t]he genesis test appears to have evolved from Stencel "); Romero ex rel. Romero v. United States, 954 F.2d 223, 225 (4th Cir.1992) (explaining that the genesis test "evolved from Stencel ” as circuits "expanded the Stencel rationale” to bar certain derivative civilian claims). Based on this out-of-circuit precedent, the majority adopts the genesis test, characterizing it as asking "whether the civilian injury has its origin in an incident-to-service injury to a service member.” Maj. Op. at 824 & n. 5.
I agree that this Court should adopt the genesis test, which is less a “test” in the true sense of the word than an acknowledgment that Feres applies to certain actions against the military that are brought by civilian claimants. But, consistent with a conduct-focused approach, I would recast the test as asking whether the civilian injury has its origin in the military’s service-related conduct toward a servicemember. I therefore disagree with our sister circuits’ characterization of the genesis test (which the majority endorses) to the extent they imply that a ser-vicemember injury is a prerequisite for Feres immunity. See Romero, 954 F.2d at 225 (characterizing the genesis test as barring civilian claims for injuries that had their “ 'genesis’ in a service-related injury to a service member”); Mossow ex rel. Mossow v. United States, 987 F.2d 1365, 1369 (8th Cir.1993) (characterizing the genesis test as barring civilian claims "when the injury to the civilian is a result of an injury to the service member”); Minns v. United States, 155 F.3d 445, 449 (4th Cir.1998) (explaining that under the genesis test, "if a non-serviceman’s injury finds its ‘genesis' in the injury suffered by a serviceman incident to service, then the Feres doctrine bars the non-serviceman's suit”).

. Because I.O.’s complaint did not allege that her servicemember mother suffered a com-pensable injury as a result of the Government's allegedly negligent administration of Benadryl, the majority labors to explain why the Government is entitled to Feres immunity despite the absence of an allegation that a servicemember was injured. See Maj. Op. at 832. Attempting to draw a distinction between legal injuries and factual injuries, the majority explains that "it is incumbent on the court to review the factual record to determine whether the facts themselves describe a factual injury to the service person” because a "prudent lawyer would never allege a legal injury to the service person” when asserting a claim for in útero injuries. Maj. Op. at 832 n. 16.
Rather than strengthen the majority’s position, this explanation — which is not supported by a single citation — reveals how precarious it is to base the military's liability for in útero injuries on the presence or absence of an injury to someone other than the child claimant. After all, the child claimant is seeking damages for its injuries, not the servicemem-ber mother's injuries. The mother is only relevant to the Feres inquiry to the extent that her status as a servicemember implicates the military's chain of command. (Indeed, there is no Feres inquiry if the mother is not a servicemember.) Because it is the service-member mother’s relationship to the military that matters, not her injuries or lack thereof, the majority’s injury-focused approach injects

.Importantly, however, as the unity of interests between mother and fetus — which is anchored in their physical inseparability while the fetus is inside the mother’s body — begins weakening during the birth process, so too does the rationale for applying Feres to in útero claims. Indeed, once a baby is born, and therefore becomes physically separate from the servicemember mother, this rationale dissipates. At that point, it makes sense to consider the military’s actions toward the baby separately from the militaiy’s actions toward the servicemember mother.

. The Feres doctrine itself has often been criticized as harsh, but the Supreme Court has not backed down in the face of such criticisms. See, e.g., Ritchie v. United States, 733 F.3d 871, 874 (9th Cir.2013) cert. denied, - U.S. -, 134 S.Ct. 2135, 188 L,Ed.2d 1124 (2014) ("For the past sixty-three years, the Feres doctrine has been criticized by ‘countless courts and commentators’ across the jurisprudential spectrum.... However, neither Congress nor the Supreme Court has seen fit to reverse course.”).

. I concur with both the majority's conclusion that I.O.'s claim is Feres-barred and its con- *842 elusion that the district court did not abuse its discretion in denying I.O. additional time and discovery to respond to the Government’s Rule 56 motion. See Maj. Op. at 833.